656 S.E.2d 737

**Myriam Therese MARQUEZ, Appellant/Respondent,**

v.

**David L. CAUDILL, John Doe, David Storm, and the South Carolina Department of Social Services, Defendants,**

**of whom David L. Caudill is Respondent/Appellant,**

**and John Doe and David Storm are Respondents.**

**No. 26421.**

Supreme Court of South Carolina.

Heard Nov. 14, 2007.

Decided Jan. 22, 2008.

230

Anita Ruth Floyd, of Conway, for appellant-respondent.

Randall K. Mullins, of North Myrtle Beach, for respondent-appellant.

Charles Richard Rhodes, Jr., of Conway, and Melissa Meyers Frazier, of North Myrtle Beach, Guardians Ad Litem.

Justice MOORE.

This is a case involving custody and visitation issues. Amy Caudill gave birth to Jason in October 1992. Jason's biological father is David Storm; however, he has never been involved in Jason's life. When Jason was a toddler, Amy married respondent/appellant (hereinafter referred to as Stepfather)[1] in February 1994. Amy gave birth to Kathryn (Katie) Caudill in December 1999. Katie's father is Stepfather.

Amy committed suicide in September 2003. A few months later, appellant/respondent (hereinafter referred to as Grandmother), who is Jason and Katie's biological maternal grandmother, filed actions seeking custody of Jason and visitation of

[1]. Although respondent/appellant is the biological father of Katie, we will call him Stepfather for purposes of these appeals.

Katie. Jason's biological father elected not to participate in the proceedings and he presented the court an affidavit of relinquishment of his parental rights and consent for adoption. The family court ruled that Stepfather would retain custody of Jason and that he could adopt Jason. Jason's biological father's parental rights were terminated. The family court also ruled that, pursuant to S.C.Code Ann. § 20–7–420(33) (Supp.2006), Grandmother would be allowed visitation with both Jason and Katie. The court further ruled that Grandmother must pay $25,000 in attorney's fees to Stepfather's attorney. Finally, the court ruled that both Grandmother and Stepfather would equally divide the fees of the guardians *ad litem.* We certified these appeals from the Court of Appeals. We now affirm.

## FACTS

Stepfather met Amy while she was pregnant with Jason. He moved in with Amy a few months after Jason's birth and they subsequently married. They had a rocky relationship and separated three times. Amy filed for divorce shortly after Katie's birth. At that time, there was an agreement for custody wherein Katie lived with Stepfather and Jason lived with Amy. They reconciled and then separated again in 2003. Stepfather left on Amy's request and filed for divorce and custody of the children. At that time, there was an agreement for joint custody. While that order was in effect, Amy committed suicide.

### Grandmother

Grandmother has a history of depression. She married her first husband at age 18 and had Amy and another daughter, Jessica, within two years. She had a miscarriage during this first marriage. She divorced her first husband and married her second husband who adopted Amy and Jessica. She then gave birth to Gina and, later, another daughter. Therefore, in six years, she had five pregnancies, four of which resulted in live births. After her youngest child was born in 1971, she became depressed and attempted suicide. She has periodically taken antidepressants. She claims she has not been depressed since 1989 until the death of her daughter in 2003.

During her second marriage, Grandmother left her children in Florida in the custody of her husband while she attended college and law school in Maryland. For three of those years, her children were also in Maryland. She saw and talked to her children often while she was in school. After school, all of her children moved back in with her.

Grandmother worked as a lobbyist in Washington, D.C., and later entered into private practice. She married twice more, with her last divorce occurring in 1996. In 1999, she moved to the state of Washington. While in private practice, she started an internet company that failed. She had to file for bankruptcy in 2001 and discharged $150,000 in liabilities.

Immediately before the family court hearing in 2005, Grandmother bought a single-family home in anticipation of gaining custody of Jason. She wanted to be near her family for support and chose the home because it was in an excellent school district. Grandmother has a net yearly income of $45,600 and testified she could financially take care of Jason.

## Stepfather

Stepfather was in the Air Force for over eleven years and was honorably discharged due to anxiety. He had one suicide attempt; however, he maintains that it was only an attempt to attract attention during a divorce. At the time of the hearing, Stepfather was taking medication for anxiety. He has previously taken other medications and, at times, would carry medicine to assist him in the event he had a panic attack.

Stepfather testified that the only time he did not take his anxiety medicine was when it was lost in the mail and he suffered withdrawal. He then remained off the medicine for two years because he felt fine. He alleged his doctor was aware of his failure to take the medicine.

Several years prior to meeting Amy, Stepfather had a child of whom he relinquished custody. He has maintained contact with this child, who is now an adult.

Prior to his separation from Amy in 2003, Stepfather met another woman, Kim Darling, on an adult website. Within three or four months after Amy's suicide, Stepfather moved Jason and Katie into his girlfriend's house. The girlfriend has twin boys that also live with them in the five bedroom home.

Jason and Katie call the girlfriend Kim, although there were allegations Stepfather was attempting to have the children call her Mom. Stepfather and Kim have since married. This is his fourth marriage. Stepfather testified that he felt it was appropriate to move in with Kim because Kim helped Jason by giving him stability. He admitted the move could have been a mistake but that it has worked out.

At the time of the hearing, Stepfather was working as a driver for Coca–Cola. His financial statement indicates that his net monthly income is $2,952.

## Jason

Jason has consistently had behavioral problems. He was first taken to counseling at the age of four as a result of being expelled from four daycare's in one year. His issues included kicking, biting, and hitting. His behavior was allegedly the result of his mother and Stepfather arguing in front of him.

Jason was admitted to counseling again around age six for extreme behavior problems at school. He underwent school-based counseling and Jason indicated he had to get between Amy and Stepfather when they fought.

Jason's third admission to counseling occurred at seven years of age and continued until 2002 when he was about ten years of age. This service was again initiated by Amy. Jason was in trouble at school for choking one child and pushing other children. Jason was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and placed on medication. He was discharged from counseling.

Jason's fourth admission to counseling was initiated by Stepfather after Amy's death. This counseling occurred between October 2003 and March 2005. Jason was accused of destroying property and acting in a threatening manner toward others. He also had suicidal thoughts. From the questionnaire, it appeared Stepfather did not know a lot about Jason's school life. During the fourth counseling session, the Department of Social Services was called by Jason's school in March 2004 because Jason had been wearing the same clothes to school for a week.[2]

---

2. However, all other testimony indicates Jason was always well-groomed, well-dressed, and healthy. Further, Stepfather testified that the allegations were deemed unfounded by DSS.

In October 2004, a therapist met with Stepfather. The therapist stated Jason had made great progress, had less anger, and was taking Strattera for ADHD. At this time, Jason was living with Stepfather, Katie, and Kim and her two children. In March 2005, counseling for Jason ended because he was doing well but also mainly because he was resistant to participating in counseling sessions.

At one point, Jason was off his ADHD medication after Christmas 2004. He had twelve incidents at school while he was off the medication.

Throughout the fourth counseling session, Jason vacillated between wanting to live with Grandmother and wanting to live with Stepfather. Jason indicated that he loved both of them and wanted to be with both of them and that it was a hard decision for him. He indicated that he enjoyed living with Kim and her children. Jason refers to Stepfather as "Dad" and Stepfather is the only father figure Jason has ever known. Grandmother admits Stepfather is a fit parent to both Jason and Katie and that Jason and Stepfather have emotionally bonded as father and son. Amy's sister and other witnesses testified that the relationship of Stepfather and Jason is as father and son and that Stepfather loves both Jason and Katie. The Guardians *ad litem* both testified that Stepfather is a fit parent.

Stepfather testified that he did not earlier seek to adopt Jason because, initially, Amy was receiving child support from the biological father and she did not want that support to stop. When the support did stop, he testified they simply did not discuss it anymore.

A couple of months before the hearing, Jason was in trouble at school for choking another child. He had also indicated he was having suicidal thoughts again. Jason's school records for 2005 indicated he was making C's, D's, and F's, and had 11 disturbing school infractions and one physical altercation (the choking incident). Stepfather testified he would seek more counseling for Jason.[3] He testified, however, that he was told by the counselor that Jason would have to be ready to receive counseling or it would not help him.

---

3. Unfortunately, at oral argument, counsel indicated that Jason has not received the counseling that he needs.

There was evidence that Stepfather favored Katie over Jason. One witness testified Stepfather and Jason's relationship was very reserved and cold on Stepfather's part. This witness felt Jason attempted to get Stepfather's attention. A former co-worker of Amy testified that Amy would often bring Jason to the convenience store where she worked. Amy indicated she had to bring Jason because she did not have anyone to babysit him. This co-worker testified that Katie stayed with her paternal grandparents but Jason was not allowed to do so.

Amy's sister, Gina, testified that when she went to retrieve Amy's remains for the funeral in Maryland, Jason and Katie were living with their paternal grandparents at the time. None of Jason's belongings were inside the house because he was living outside in a camper. Katie, on the other hand, had a bedroom filled with toys and clothes inside her grandparents' house. Gina further testified that Stepfather focuses all of his attention on Katie and does not engage in any physical contact, such as hugging, with Jason. She mentioned that Stepfather told Jason he could not cry at his mother's memorial service that was held in South Carolina.

On the other hand, Stepfather presented two witnesses who stated Stepfather plays video games with Jason, that Stepfather appropriately disciplines Jason, and that Stepfather mostly took care of the children while Amy was alive. Stepfather did most of the cooking and feeding of the children. One of Stepfather's witnesses stated he treats Katie "a little bit better" than Jason.

Grandmother was present at Jason's birth and she saw Jason monthly until he was over 2 years old. She did not see him in 1995. From 1996 to 1999, Grandmother saw Jason about eleven times. She did not see him in 2000. From 2001 to 2003, Grandmother allegedly saw Jason three times.[4] After Amy's death, she did not see Jason again until September 2004. As of the hearing, she had seen Jason for five visits.

---

4. Although Grandmother indicated she saw Jason three times between 1999 and 2004, the family court found she did not see Jason from 1999 until after Amy's death in 2003.

*Katie*

Katie was born in 1999 and she and Jason are seven years apart; however, they have a good relationship. Both Guardians testified that Jason and Katie should not be divided.

Grandmother was not present at Katie's birth and saw Katie twice between 2001 and 2003. She did not see Katie again until after Amy's death. Grandmother testified that she could not visit Katie due to financial restraints. Amy's sister, Gina, testified that she never visited Katie from her birth to Amy's death.

## STANDARD OF REVIEW

In appeals from the family court, the appellate court has jurisdiction to find facts in accordance with its view of the preponderance of the evidence. *Strickland v. Strickland,* 375 S.C. 76, 650 S.E.2d 465 (2007). This broad scope of review does not require the reviewing court to disregard the findings of the family court; appellate courts should be mindful that the family court, who saw and heard the witnesses, sits in a better position to evaluate credibility and assign comparative weight to the testimony. *Id.* Because the appellate court lacks the opportunity for direct observation of the witnesses, it should accord great deference to trial court findings where matters of credibility are involved. *Dodge v. Dodge,* 332 S.C. 401, 505 S.E.2d 344 (Ct.App.1998).

## GRANDMOTHER'S APPEAL

### ISSUES

I. Did the family court err by failing to award custody of Jason to Grandmother?

II. Did the family court err by awarding attorney's fees to Stepfather?

## DISCUSSION

### I. Custody

The family court found that both Grandmother and Stepfather would be fit parents. The court found that Stepfather has played an important role in rearing Jason and that,

although he has not been the perfect father, he has been the only father figure that Jason has ever known. The court noted that the evidence establishes a degree of attachment and psychological bonding as father and son.

The family court found that, while Stepfather has shown poor judgment by living with his fiancée and her two children prior to marriage, visiting pornographic websites, and not always taking his medication, there was no evidence that this behavior has had any detrimental effect on Jason. The family court found that Stepfather has an appropriate home for Jason.

As to Grandmother, the family court found that she is fit to be a parent although she has had problems, including depression. The family court noted that Grandmother was forced to declare bankruptcy at one point. The court stated it "was struck by her cavalier attitude to this financial experience."

The family court found that Grandmother did not have a great deal of contact with Jason prior to Amy's death. However, he noted that she and Jason love each other and that Jason views her as his grandmother and not as a mother figure.

The family court found that it is in Jason's best interest to be in the custody of Stepfather due to their relationship. He also noted that he did not believe Jason should be separated from Katie given both guardians recommend that the children remain together. The family court stated that Jason needs as much stability as possible and that Jason would find this by remaining with the only father he has ever known and his biological sister.

The family court further found that, because Stepfather has custody of Jason, Stepfather's adoption of Jason should be approved. The family court ordered the adoption although Jason's guardian did not advocate the adoption because the guardian did not believe Stepfather would foster the relationship between Grandmother and Jason.

■■ The best interest of the child is the primary and controlling consideration of the Court in all child custody controversies. *Moore v. Moore*, 300 S.C. 75, 386 S.E.2d 456 (1989). There is a rebuttable presumption that it is in the

best interest of any child to be in the custody of its biological parent. *Id.* However, in this case we do not have a biological parent seeking custody of Jason. We have a biological maternal grandmother versus a stepfather who has essentially raised Jason since birth.

We recognized the notion of a psychological parent in *Moore v. Moore, supra.* In *Moore*, a biological father attempted to regain custody of his child after a temporary relinquishment due to hardships from third parties. We stated that even though there may exist a psychological parent-child relationship, the mere existence of such a bond is an inadequate ground to justify awarding permanent custody to the psychological parent. We ruled that the child should be returned to the biological father.

The Court of Appeals mentioned the psychological parent doctrine in *Dodge v. Dodge,* 332 S.C. 401, 505 S.E.2d 344 (Ct.App.1998). The *Dodge* court found that although the subject children had a close and loving relationship with their stepfather and grandparents, the level of attachment did not rise to the level of a psychological parent-child relationship. The *Dodge* court found the family court should have awarded the biological father full custody.

In *Middleton v. Johnson,* 369 S.C. 585, 633 S.E.2d 162 (Ct.App.2006), the Court of Appeals noted that, while both *Moore* and *Dodge* recognized the existence of the psychological parent doctrine, neither case explored how a party establishes that he or she is the psychological parent to a child of a fit, legal parent. The Court of Appeals fleshed out the meaning of a psychological parent. The court reviewed the law in other states and found that some states define a psychological parent by breaking down parenthood to its fundamental elements. The court noted that in California, for example, a *de facto* parent is defined as a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period. *Middleton,* 369 S.C. at 595, 633 S.E.2d at 168 (citations omitted). The court noted that some states have expanded the definition of psychological parent, and that Wisconsin has developed a four-prong test for deter-

mining whether a person has become a psychological parent. *Id.* at 596–597, 633 S.E.2d at 168 (citations omitted).

The Court of Appeals chose to adopt the four-prong test, stating that this test provides a good framework for determining whether a psychological parent-child relationship exists and that the test would ensure that a nonparent's eligibility for psychological parent status will be strictly limited.

■ The four-prong test states that, in order to demonstrate the existence of a psychological parent-child relationship, the petitioner must show:

(1) that the biological or adoptive parent[s] consented to, and fostered, the petitioners formation and establishment of a parent-like relationship with the child;

(2) that the petitioner and the child lived together in the same household;

(3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; [and]

(4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

*Middleton, supra* (quoting *In re Custody of H.S.H.-K.,* 193 Wis.2d 649, 533 N.W.2d 419, 435–36 (1995)[5]). The Court of Appeals discussed each prong of the test.

Regarding the first prong, the court noted the first factor is critical because it makes the biological or adoptive parent a participant in the creation of the psychological parent's relationship with the child. This factor recognizes that when a legal parent invites a third party into a child's life, and that invitation alters a child's life by essentially providing him with another parent, the legal parent's rights to unilaterally sever that relationship are necessarily reduced. *Id.* at 597, 633 S.E.2d at 168–169.

---

**5.** *Cert. denied, Knott v. Holtzman,* 516 U.S. 975, 116 S.Ct. 475, 133 L.Ed.2d 404 (1995).

Regarding the second prong, the court stated the requirement that the psychological parent and the child have lived together further protects the legal parent by restricting the class of third parties seeking parental rights. *Id.* at 598, 633 S.E.2d at 169.

The court stated that the last two prongs are the most important because they ensure both that the psychological parent assumed the responsibilities of parenthood and that there exists a parent-child bond between the psychological parent and child. The psychological parent must undertake the obligations of parenthood by being affirmatively involved in the child's life. The psychological parent must assume caretaking duties and provide emotional support for the child. The Court of Appeals stated that these duties, however, must be done for reasons other than financial gain, which guarantees that a paid babysitter or nanny cannot qualify for psychological parent status. The court further noted that when both biological parents are involved in the child's life, a third party's relationship with the child could never rise to the level of a psychological parent, as there is no parental void in the child's life. *Id.* at 598, 633 S.E.2d at 169 (citation omitted).

We find the Court of Appeals' adoption of the four-prong psychological parent test is appropriate. It is a reasoned way to analyze situations such as the one present in the *Middleton* case [6] and in the instant case.[7] It is an appropriate extension of the Moore case.[8] As the Court of Appeals noted, the test

---

6. In *Middleton,* an ex-boyfriend brought an action seeking visitation of his ex-girlfriend's biological son based on the fact he had played a prominent role in the child's life. The Court of Appeals utilized the four-prong test to find that Middleton was the child's psychological parent and that allowing him visitation was in the child's best interest.

7. The *Middleton* court cautioned that its decision does not automatically give a psychological parent the right to demand *custody* in a dispute between the legal parent and psychological parent. While *Middleton* was concerned with visitation by a psychological parent, in the instant case, a legal parent no longer exists. In this situation, the *Middleton* analysis applies to a custody determination between an alleged psychological parent and a third party.

8. The *Moore* line of cases do not apply in the instant case because Jason has never lived outside of his stepfather's and parent's home for a substantial period of time. The *Moore* case involves a natural parent

will limit the persons who may seek to be considered a psychological parent, but it will assist those who are worthy to be called such.

Utilizing the four-prong test, we find Stepfather has met the requirements of a psychological parent. The first prong is whether Amy, as the biological parent, consented to, and fostered, Stepfather's formation and establishment of a parent-like relationship with Jason. Shortly after Jason's birth, Amy and Stepfather moved in together and a few months later they married. Amy did not want Stepfather to adopt Jason because she would lose the child support she was receiving from the biological father. After that support ceased, the issue either never arose again as Stepfather testified, or as the maternal family suggested, Amy did not wish to have Stepfather adopt Jason. In any event, at the time of the final separation, Stepfather and Amy had agreed to joint custody of Jason. The evidence supports a finding that Stepfather has met this element.

Stepfather has met the second prong to determine whether he is a psychological parent. He and Jason have always lived together in the same household; that is, except for times of separation between he and Amy.

The third prong is whether Stepfather has assumed obligations of parenthood by taking significant responsibility for Jason's care, education and development, including contributing towards Jason's support, without expectation of financial compensation. Since Amy's death, Stepfather has clearly met this prong. However, the evidence was not as clear as to whether he met this prong prior to her death. Some testimony indicated Stepfather preferred Katie to Jason and spent his time with Katie instead of Jason. The evidence also indicated that before her death, Amy was the person who ensured Jason received counseling and talked to his counselors. However, other testimony indicated Stepfather was the one in charge of both children; that he cooked for and fed the children, and that he disciplined the children. There is no indication in the

---

versus a third party who has had possession of and cared for the child. In the instant case, a natural parent is no longer involved and the third party, Grandmother, has never possessed Jason and has only had visits with him.

evidence regarding financial support; however, given both Stepfather and Amy were employed, married, and all living in the same household, one can assume that he has provided financial support for Jason throughout his life. After reviewing all the evidence, we find Stepfather has also met this prong.

The fourth prong is whether Stepfather has been in a parental role for a length of time sufficient to have established with Jason a bonded, dependent, parental relationship. The evidence that Stepfather meets this prong is clear. Jason has always referred to Stepfather as "Dad," and Stepfather is the only father figure Jason has ever known. Grandmother admitted that Stepfather and Jason have bonded as father and son. Therefore, Stepfather has met the requirements to be considered a psychological parent to Jason.

Grandmother cannot meet the test of whether she is a psychological parent because she does not meet the prongs stated above. It must be remembered that this is a custody action between a stepfather and a grandmother. A biological parent is not involved; and therefore, there is no reason to recognize the superior rights of a natural parent in this case. Grandmother cannot step into her daughter's place. Although her daughter has died, Grandmother remains a third party seeking custody.

While there was evidence indicating Stepfather is not perfect and sometimes shows bad judgment, there is no requirement that a person be perfect in order for custody to be granted. Because Stepfather is Jason's psychological parent and is, in fact, the only father he has ever known, we find the family court appropriately determined that it was in Jason's best interest for Stepfather to have custody of him.[9]

## II. Attorney's Fees

■ The family court found that Stepfather prevailed on a majority of the issues in this case, i.e. custody and adoption,

---

9. Regarding the family court's decision to grant Stepfather's request to adopt Jason, the family court did not err by allowing the adoption given the analysis above. *See* S.C.Code Ann. § 20-7-1820 (Supp.2006) (any person may adopt his spouse's child and the requirements for doing so are lessened).

and that he does not have the ability to pay all of the attorney's fees he has incurred. On the other hand, he found Grandmother, as a practicing attorney, has the ability to earn substantial income and has sufficient assets which she can apply towards the satisfaction of Stepfather's attorney's fees.

The court found that Stepfather's attorney has been practicing law for approximately nineteen years and devotes a substantial portion of his practice to domestic litigation and that the fees he has charged are reasonable and within the norms of hourly rates in Horry County. After a review of the factors in *Glasscock v. Glasscock,* 304 S.C. 158, 403 S.E.2d 313 (1991), the court ordered Grandmother to pay Stepfather $25,000 in attorney's fees.

 The decision to award attorney's fees is a matter within the sound discretion of the trial judge and the award will not be reversed on appeal absent an abuse of discretion. *Buckley v. Shealy,* 370 S.C. 317, 635 S.E.2d 76 (2006). The factors used to determine a reasonable attorney's fee are: (1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; (6) customary legal fees for similar services. *Glasscock v. Glasscock, supra.* While "contingency of compensation" is an appropriate factor considered in awarding attorney's fees, the contingency to be considered is whether the party on whose behalf the services were rendered will be able to pay the attorney's fee if an award is not made. Further, the factor "beneficial results obtained" merely aids in determining whether an award is appropriate when considering whether the services of a lawyer facilitated a favorable result. *Id.*

We find the family court did not abuse its discretion in requiring Grandmother to pay Stepfather's attorney's fees. The family court's findings are consistent with an application of the *Glasscock* factors. The family court properly noted that Stepfather has prevailed on a majority of the issues and that he does not have the ability to pay all of the attorney's fees he has incurred. Stepfather's financial statement showed that almost all of his paycheck is used to pay bills. He also

testified that without his father's financial help he would have been unable to afford the litigation.

The family court properly found that Grandmother, as a practicing attorney, has the ability to earn substantial income and has sufficient assets she can apply towards the satisfaction of Stepfather's attorney's fees. The family court stated it had reviewed the *Glasscock* factors and found an award should be made to Stepfather. The family court did not abuse its discretion in awarding attorney's fees to Stepfather.[10] *See Patel v. Patel,* 359 S.C. 515, 599 S.E.2d 114 (2004) (an abuse of discretion occurs either when a court is controlled by some error of law, or where the order is based upon findings of fact lacking evidentiary support).

## STEPFATHER'S APPEAL

### ISSUES

I. Did the family court err by requiring a fit parent to proceed with specific grandparent visitation when the statute utilized is unconstitutional or is unconstitutional as applied to Stepfather?

II. Did the family court err by requiring Stepfather to be responsible for the payment of guardian *ad litem* fees?

## DISCUSSION

### I. Grandparent Visitation

■ The family court found that, because the adoption of Jason was approved, it would analyze the visitation issue as if Stepfather is the biological father of both children. The family court found that, as we ruled in *Camburn v. Smith,* 355 S.C. 574, 586 S.E.2d 565 (2003), the grandparent visitation statute could be applied constitutionally. The family court found that, due to the particular facts of this case, maintaining the ties between the mother's family and the children present compelling and exceptional circumstances to justify ordering

---

10. Stepfather argues the award was reasonable due to Grandmother's dilatory tactics regarding discovery. Twice during the hearing, the family court stated that he should impose sanctions given how untimely Grandmother's responses were.

visitation with Jason and Katie. After reviewing what amount of visitation is rationally related to achieve its stated goal of maintaining the mother's memory and what is in the children's best interest, the court specified the amount of visitation. Grandmother was allowed two weeks of visitation during the summer months and one week during the Christmas holidays. Grandmother was to be responsible for arranging all transportation and its related costs.

Stepfather argues that the grandparent visitation statute, S.C. Ann. § 20-7-420(A)(33), is either unconstitutional on its face, pursuant to *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), or as applied to the instant situation. Section 20-7-420(A)(33) provides that the family court has exclusive jurisdiction to:

order periods of visitation for the grandparents of a minor child where either or both parents of the minor child is or are deceased, or are divorced, or are living separate and apart in different habitats regardless of the existence of a court order or agreement, and upon a written finding that the visitation rights would be in the best interests of the child and would not interfere with the parent/child relationship. In determining whether to order visitation for the grandparents, the court shall consider the nature of the relationship between the child and his grandparents prior to the filing of the petition or complaint.

We addressed the constitutionality of the grandparent visitation statute in *Camburn v. Smith*, 355 S.C. 574, 586 S.E.2d 565 (2003). In *Camburn*, we stated that it is well-settled that parents have a protected liberty interest in the care, custody, and control of their children and that this is a fundamental right protected by the Due Process Clause. *Id.* at 579, 586 S.E.2d at 567 (citing *Troxel, supra*). We noted that, under *Troxel*, the court must give "special weight" to a fit parent's decision regarding visitation. *Id.* A court considering grandparents visitation over a parents objection must allow a presumption that a fit parents decision is in the child's best interest:

[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to

further question the ability of that parent to make the best decisions concerning the rearing of that parents children. *Id.* at 579, 586 S.E.2d at 567–568 (quoting *Troxel, supra* ). Parental unfitness must be shown by clear and convincing evidence. *Id.* (citations omitted).

The presumption that a fit parents decision is in the best interest of the child may be overcome only by showing compelling circumstances, such as significant harm to the child, if visitation is not granted. *Id.* The fact that a child may benefit from contact with the grandparent, or that the parents refusal is simply not reasonable in the courts view, does not justify government interference in the parental decision. *Id.* In *Camburn,* we stated that, in sum, parents and grandparents are not on an equal footing in a contest over visitation. Before visitation may be awarded over a parents objection, one of two evidentiary hurdles must be met: the parent must be shown to be unfit by clear and convincing evidence, or there must be evidence of compelling circumstances to overcome the presumption that the parental decision is in the child's best interest. *Id.* at 579–580, 586 S.E.2d at 568. Accordingly, we have already ruled that the grandparent visitation statute is not facially invalid because it can be constitutionally applied in the appropriate circumstances.

Applying the statute and *Camburn* to the facts here, there has been no finding that Stepfather is unfit; in fact, Grandmothers attorneys conceded and the family court found that Stepfather is a fit parent.[11] We hold that a biological parents death and an attempt to maintain ties with that deceased parents family may be compelling circumstances justifying ordering visitation over a fit parents objection. We find visitation here is in the childrens best interest to further the relationship between the children and the mothers family. We further find the visitation ordered by the family court would not excessively interfere in Stepfathers relationship with the children. Therefore, the family court did not err by awarding Grandmother visitation.

---

11. Because the family court properly allowed Stepfather to adopt Jason, we likewise address this issue as if Stepfather is the parent of Jason.

## II. Guardian *ad litem* Fees

 The family court found that both of the guardians *ad litem* had properly performed their services and were entitled to payment of their fees and expenses. The court ruled that each party would be equally responsible for the balance of the fees owed to the guardians. We find the family court did not abuse its discretion by splitting the guardian fees between the parties. *See Shirley v. Shirley*, 342 S.C. 324, 536 S.E.2d 427 (Ct.App.2000) (an award of guardian *ad litem* fees lies within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of discretion).

## CONCLUSION

In conclusion, we find Stepfather has met the requirements of being a psychological parent and, as such, he was properly awarded custody of Jason. We find the family court did not err by ordering Grandmother to pay a portion of Stepfather's attorney's fees and by ordering the parties to share equally the costs of the guardian fees. Finally, we find the family court appropriately awarded Grandmother visitation of the children. Given our disposition of the appeals, we find it is unnecessary to address Stepfather's Issues V and VI. *Cf. Whiteside v. Cherokee County Sch. Dist. No. One*, 311 S.C. 335, 428 S.E.2d 886 (1993) (appellate court need not address remaining issue when resolution of prior issue is dispositive). Accordingly, the decision of the family court is

**AFFIRMED.**

WALLER and BEATTY, JJ., concur. TOAL, C.J., concurring in part and dissenting in part in a separate opinion in which PLEICONES, J., concurs.

Chief Justice TOAL.

I agree with the majority by and large; however, I would reverse the portion of the family court's order awarding Stepfather $25,000 in attorneys' fees.

This was an extremely close case, and although Stepfather ultimately prevailed on the merits of the custody issue, the family court awarded Grandmother significant visitation rights. Grandmother has incurred substantial expenses as a

result of this litigation and, pursuant to the family court's order, is now responsible for visitation costs. *See E.D.M. v. T.A.M.*, 307 S.C. 471, 476–77, 415 S.E.2d 812, 816 (1992) (holding that in deciding whether to award attorney's fees, the family court should consider the beneficial results obtained by counsel, the parties' ability to pay their own fee, the respective financial conditions of the parties, and the effect of the fee on each party's standard of living). In my opinion, it is instructive that the family court ordered Stepfather and Grandmother to be equally responsible for the guardian *ad litem* fees, and I would hold that the family court should have applied this reasoning to the issue of attorneys' fees.

Accordingly, I would reverse this portion of the family court's order and hold each party responsible for his and her own attorney's fees.

PLEICONES, J., concurs.