**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Jessica Elaine Dull, Respondent,

v.

Robert Gail Dull, Eric Winn, Defendants,

Of Whom Robert Gail Dull is the Appellant.

Appellate Case No. 2018-001589

---

Appeal From Greenville County
Rochelle Y. Conits, Family Court Judge

---

Unpublished Opinion No. 2021-UP-274
Submitted June 1, 2021 – Filed July 14, 2021

---

**AFFIRMED**

---

Kim R. Varner, of Varner & Segura, and J. Falkner Wilkes, both of Greenville, for Appellant.

Deborah M. Gentry, of Murdock Law Firm, LLC, of Mauldin, for Respondent.

---

**PER CURIAM:** Jessica Elaine Dull (Wife) filed this divorce action in June 2016 against Robert Gail Dull (Husband) and Eric Winn seeking, *inter alia*, a divorce, removal of Husband's name from a two-year-old minor's birth certificate, an order

to change the minor's last name, and attorney's fees.  Husband appeals the divorce decree, arguing the family court erred in (1) finding he was not the psychological parent of the minor child; (2) being unduly influenced by the guardian ad litem (GAL); (3) awarding Wife attorney's fees; and (4) its allocation of GAL fees.  We affirm.

## FACTUAL BACKGROUND

The parties stipulated the minor child's biological father is Winn.  Wife and Winn reached an agreement on custody and visitation.  Mutual restraining orders regarding Husband and Wife were entered in June 2016.  In Husband's request for a restraining order, he maintained that although the child was born during the marriage, he was not the father and was not seeking either custody or visitation with the child.  However, by the time of the final hearing, he was seeking custody and/or visitation as a psychological parent.

Wife and Husband began their relationship in February 2013.  Wife left Husband in July 2013, established a relationship with Winn, and returned to Husband in November 2013 pregnant with Winn's child.  Husband was aware of the pregnancy and married Wife in March 2014, one month prior to the child's birth.  Wife named Husband as the child's father on the birth certificate.  Wife left Husband in May or June of 2016, when the child had just turned two years old.  Husband paid for all of the child's needs during the marriage while Wife provided child care and housework as a stay-at-home mom.  Husband and Wife's relationship was tumultuous, causing the break-up of the marriage.  At the time of the hearings in 2018, Wife was thirty years old and Husband was fifty-six or fifty-seven years old.

Wife and her witnesses downplayed the relationship between Husband and the child, testifying Husband had little involvement in the child's life during the two years Wife was with him.  Wife testified Husband ceased providing anything for the child once she left him.  She also testified regarding the following: Husband showed a lack of interest in the child other than jealousy; the child called Husband Rob or Robbie and called Wife's father Dad or Papa; and Husband had seen the child only three times between June 2016 and August 2018, including a two-day visit in August 2017 with Wife and one time during a visit with the child's GAL.

Husband introduced pictures of him with the child and introduced testimony indicating he had a loving and parental relationship with the child until Wife left.  Husband testified the child called him daddy, and while he and Wife were together, they co-parented the child.  He admitted to Dr. Marc Harari, who performed

psychological evaluations on Husband and Wife, that Wife did the majority of the childcare. Husband's ex-wife testified the child was affectionate with Husband and called him daddy.

Husband's therapist, Dr. Shawna Kirby, testified Husband sought her services beginning in November 2016. Kirby concluded Husband should be considered a "psychological parent." Throughout Kirby's notes, Husband's primary focus was on preparing for the stages of the pending divorce proceedings and obtaining custody of the child.

Throughout the trial, Nela Laughridge, the GAL, cross-examined witnesses, testified, introduced evidence, and submitted a report to the court. The GAL was appointed on July 14, 2016, and her report was entered into evidence without objection. The GAL had no concerns with Wife's interactions with the child and found the child was happy, well-cared for, and emotionally bonded to Wife. As to Husband, the GAL testified "there's just somethin' about him and I just can't put my finger on it." The GAL compared Husband's personality to Wife's, finding them similar and together creating chaos. She found there was truth to both sides of their story with much exaggeration by each. The GAL also observed Husband had "an obsessive-like quality" and was "fixated on [Wife's] goings, comings, [and] behaviors . . . ."

The GAL acknowledged Husband could probably be a good parent; however, she thought the parties' relationship was too complex to overcome. She also concluded Husband had likely been a psychological parent to the child when the parties were together, but she was not sure it was enough, and she did not think Husband and Wife could co-parent. The GAL reported Husband believed a strong connection with the child still existed, but it did not appear so to her, and the GAL had grave concerns due to Husband's "demeanor[, which was] somewhat unusual and a little bit distant." She explained that despite the bond Husband felt toward the child, the bond at issue was the one the child felt toward Husband. She concluded the child did not feel a bond with Husband. Finally, the GAL testified she was very concerned Husband's interest in the child was closely tied to his interest in Wife.

In her written report, the GAL noted Husband did not see the child for fifteen months after he turned two years old, saw him then for two days, and did not see him again for six months, when the GAL, Husband, and the child met. According to the GAL, while the child initially exhibited some familiarity with Husband and was relaxed and happy, the child was wary of physical closeness, did not notice when Husband left the room for a few minutes, and was unaffected by Husband's

final departure. After Husband left, the child did not know who he was, indicated he had never met him, and did not know his name. When given a name prompt by the GAL, the child knew Husband as the "bad Robby that was trying to take him away from Mommy." The GAL discussed the elements of the psychological parent test, recognized Husband met some of them, and noted her report was only to aid the court because she was statutorily prohibited from making a recommendation concerning which party should be awarded custody.

Dr. Harari's psychological evaluations were also entered into evidence. He had no concerns regarding either Husband's or Wife's ability to care for the child. However, Dr. Harari found Husband might focus on himself rather than the best interests of the child.

In its final order, the family court granted Wife a divorce and awarded Wife sole custody of the child. The court declared Winn was the child's biological father, denied Husband's request to be designated a psychological parent of the child, and ordered the birth certificate be changed. The court ordered Husband to pay Wife's attorney's fees and ordered Husband and Wife to each pay their remaining balances due to the GAL. This appeal follows.

## STANDARD OF REVIEW

On appeal from the family court, "the applicable standard of review" is de novo. *Stoney v. Stoney*, 422 S.C. 593, 594, 813 S.E.2d 486, 486 (2018). Although this court reviews the family court's findings de novo, we are not required to ignore the fact that the family court, which saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Lewis v. Lewis*, 392 S.C. 381, 384–85, 709 S.E.2d 650, 651–52 (2011). This "standard of review does not relieve an appellant from demonstrating error in the [family] court's findings of fact." *Id*. at 385, 709 S.E.2d at 652.

## LAW/ANALYSIS

## I.      Psychological Parenthood

Husband argues the family court erred in finding he was not the child's psychological parent. We disagree.

In any custody action, the best interests of the child is the "primary and controlling consideration." *Moore v. Moore*, 300 S.C. 75, 78–79, 386 S.E.2d 456, 458 (1989).

There is a presumption that a child's best interests are served by being placed in the custody of its biological parents; however, this presumption is rebuttable. *Id.* at 79, 386 S.E.2d at 458. However, "[t]o further promote the goal of safeguarding the best interests of children, the General Assembly has recognized that in certain circumstances, persons who are not a child's parent or legal guardian may be proper parties to a custody proceeding." *Middleton v. Johnson*, 369 S.C. 585, 594, 633 S.E.2d 162, 167 (Ct. App. 2006); *see* S.C. Code Ann. § 63-3-530(A)(20) (2010) (granting the family court jurisdiction to award custody of a child "to either spouse, or to any other proper person or institution").

In light of this, our supreme court recognized the doctrine of psychological parenthood in *Moore*. 300 S.C. at 80–81, 386 S.E.2d at 459. In *Middleton*, 369 S.C. at 596–97, 633 S.E.2d at 168, this court "fleshed out the meaning of a psychological parent" and "adopted [a] four-prong test" to "determin[e] whether a psychological parent-child relationship exists." *Marquez v. Caudill*, 376 S.C. 229, 241–42, 656 S.E.2d 737, 743 (2008). The *Middleton* test "ensure[s] that a nonparent's eligibility for psychological parent status will be strictly limited." *Id.* at 242, 656 S.E.2d at 743.

To establish a psychological parent-child relationship under the *Middleton* test, a party must show:

> (1) that the biological or adoptive parent[s] consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; [and] (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

369 S.C. at 596–97, 633 S.E.2d at 168 (quoting *In re Custody of H.S.H.K*, 533 N.W.2d 419, 435–36 (Wis. 1995)).

In this case, the family court found Husband met the first prong of the *Middleton* test because Wife "most definitely consented to and fostered the formation and

establishment of a parent-like relationship between" Husband and the child. Our court in *Middleton* recognized this prong is met "when a legal parent invites a third party into a child's life, and that invitation alters a child's life by essentially providing him with another parent." *Id.* at 597, 633 S.E.2d at 169. The court thus concluded, "the legal parent's rights to unilaterally sever that relationship are necessarily reduced." *Id.* The family court also found Husband met the second prong because the child "came home from the hospital to the home of [Husband] and resided [there] until he was" two years and one month old.

As to the third prong, the family court found Husband provided "a home, food, medical care, health insurance, and other incidents of support <u>for so long as the parties were together</u>." However, once Wife left the marriage, Husband terminated all financial support other than allowing the child to remain on his health insurance for a period of time. The court found Husband held "strings . . . attached to the support of this child" based on whether he believed the parties would reconcile.

Finally, the family court found Husband failed to establish the fourth prong. Noting the child's lack of a bond toward Husband at the GAL visit, the amount of time that elapsed between the child leaving Husband's home and the present, and the child's age at the time of the hearing compared to the time with Husband, the family court found "absolutely no bond whatsoever to maintain by establishing [Husband] as a psychological parent to [the child]." The court also concluded,

> There absolutely would be no emotional harm or distress to [the child] should [Husband's] legal relationship to him be terminated. In fact, this [c]ourt finds just the opposite to be true, to wit: it would be detrimental to the physical health, safety, and emotional well-being of this child to re-introduce [Husband] back into his life in any manner whatsoever.

We agree with the family court's findings regarding this prong and also find Husband's cessation of support of the child once the child left the home indicative of the lack of a bonded relationship on Husband's behalf.

We have reviewed the record under our de novo standard of review and likewise find Husband failed to establish he was the child's psychological parent. Although Husband presented evidence to establish the first two of the four prongs of the test, he has failed to demonstrate error in the family court's findings as to the other two prongs. *See Lewis*, 392 S.C. at 388, 709 S.E.2d at 653 (explaining that although

this court reviews the family court's findings de novo, we are not required to ignore the fact that the family court, which saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony); *id.* at 390, 709 S.E.2d at 654 ("The highly fact-intensive nature of family court matters lends itself to a respect for the factual findings of our able and experienced family court judges who are in a superior position to assess the demeanor and credibility of witnesses."); *id*. at 392, 709 S.E.2d at 655 (noting an appellant bears the burden of proving the greater weight of evidence is against the family court's findings).

## II.    GAL

Husband next argues the family court was unduly influenced by the GAL, whom he alleges was biased against him and acted as an advocate/lawyer rather than a GAL.  We disagree.

"A guardian ad litem is a representative of the court appointed to assist it in properly protecting the interests of an incompetent person."  *Shainwald v. Shainwald*, 302 S.C. 453, 457, 395 S.E.2d 441, 444 (Ct. App. 1990); S.C. Code Ann. § 63-3-830(A)(1) (2010) ("The responsibilities and duties of a [GAL] include, but are not limited to . . . representing the best interest of the child."). "[T]he extent to which a guardian ad litem is permitted to testify . . . is left to the sound discretion of the trial judge."  *Shainwald*, 302 S.C. at 457, 395 S.E.2d at 444.  "The typical guardian's role [in a custody case] . . . is to investigate the facts, interview witnesses, present witnesses at trial, and cross-examine witnesses."  21 S.C. Jur. *Children & Families* § 132 (May 2021).  However, a GAL is statutorily prohibited from including "a recommendation concerning which party should be awarded custody" in a final written report "unless requested by the court . . . ." S.C. Code Ann. § 63-3-830(A)(6) (2010).

In this case, the GAL discussed the good and bad of all parties, zealously represented the interests of the child throughout the proceedings, presented a thorough and detailed report, and refrained from making a custody recommendation.  She found Husband and Wife had similar personalities, and she discussed each of their shortcomings and strengths.  She acknowledged Husband had bonded with the child and he could probably be a good parent; however, she also recognized the issue was not Husband's bond to the child, but the child's bond to Husband.  She found the child was happy, well-adjusted, and emotionally bonded to Wife.

After a review of the GAL's role in the case, her testimony, and her written report, we find no bias exhibited by the GAL. In addition, we find the GAL did not exceed her authority by participating in the trial. Rather, we find the GAL, as appropriate, kept the child's best interests paramount in her consideration. Finally, we find the family court was not unduly influenced by the GAL. In its order, the family court made extensive findings of fact from the testimony and exhibits of all parties. The court noted its findings of credibility of the parties. There is no indication in the record or final order that the family court was unduly influenced by the GAL.

### III.    Attorney's Fees

Husband argues the family court erred in awarding Wife attorney's fees because it failed to cite the applicable factors it used in awarding the fees. We find no reversible error.

In determining whether attorney's fees should be awarded in family court, the court considers "(1) the party's ability to pay his/her own attorney's fee; (2) beneficial results obtained by the attorney; (3) the parties' respective financial conditions; [and] (4) [the] effect of the attorney's fee on each party's standard of living." *E.D.M. v. T.A.M.*, 307 S.C. 471, 476–77, 415 S.E.2d 812, 816 (1992). Appellate courts review a family court's award of attorney's fees de novo. *Stone v. Thompson*, 428 S.C. 79, 92, 833 S.E.2d 266, 272 (2019).

Despite failing to cite the law and each factor, it is clear the family court considered the appropriate factors in awarding Mother attorney's fees. The court stated, "[Wife] has obtained beneficial results in this matter in prevailing on the ultimate issue of psychological parent." The court also found Husband's financial ability to pay the fees was far superior to Wife's financial ability. Finally, the court concluded "[s]hould [Wife] have to pay these fees, it would substantially effect the standard of living for this minor child." We find the family court properly considered the appropriate factors in awarding Wife attorney's fees. In addition, based on our de novo review, we find the record supports an award of fees.

### IV.    GAL Fees

Husband lastly argues the family court erred in failing to equitably allocate the GAL fees between all three parties, including Winn. We find this issue abandoned on appeal.

Husband makes only a conclusory argument and fails to cite any case law for this proposition. Thus, we find he abandoned the issue on appeal. *See First Sav. Bank v. McLean*, 314 S.C. 361, 363, 444 S.E.2d 513, 514 (1994) (considering an issue abandoned because the appellant failed to provide pertinent argument or supporting authority).

**AFFIRMED.**[1]

**WILLIAMS, THOMAS, and HILL, JJ., concur.**

---

[1] We decide this case without oral argument pursuant to Rule 215, SCACR.