**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Linda Charles, Respondent,

v.

Craig Doehner, Sharon Doehner and Eric J. Perry, Defendants,

Of whom Craig Doehner and Sharon Doehner are Appellants,

and Eric J. Perry is a Respondent.

Appellate Case No. 2019-001915

———————

Appeal From Georgetown County
Ronald R. Norton, Family Court Judge

———————

Unpublished Opinion No. 2021-UP-005
Submitted December 18, 2020 – Filed January 5, 2021

———————

**AFFIRMED**

———————

Allison Bullard McNair, of Building Families LLC, of Columbia, for Appellants.

Brana J. Williams, of Williams Law Firm, LLC; and Ryan A. Stampfle, of Indigo Family Law, LLC, both of Surfside Beach, for Respondent Linda Charles.

Eric J. Perry, pro se.

Laura Mitchum Moyer, of Maring & Moyer, LLC, of Georgetown, as Guardian ad Litem.

---

**PER CURIAM:** Craig and Sharon Doehner appeal an order awarding Linda Charles grandparent visitation of Child 1, Child 2, and Child 3 (collectively, Children). On appeal, the Doehners argue the family court erred in (1) finding Charles was unreasonably denied visitation for ninety days, (2) granting Charles visitation without finding either the Doehners were unfit or compelling circumstances supported awarding visitation, and (3) finding visitation was in Children's best interest. We affirm.

The Doehners are Children's maternal grandparents, and Charles is Children's paternal grandmother. Jessica Hill (Mother) and Eric J. Perry (Father; collectively, Parents) were married when Children were born. Parents struggled with substance abuse issues, and prior to 2014, Charles—who lived nearby—often stepped in to care for Children. According to Charles, she was around Children frequently during the first eight-and-a-half years of Child 1's life. She testified, "I babysat them. They stayed with me overnight. They stayed with me for days at a time. It was a good relationship." Charles often drove Children to school or daycare. At that time the Doehners lived in North Carolina and visited Children during holidays and in the summer.

Prior to 2010, Parents helped Charles operate a bait shop that Charles and her late husband owned and operated for many years. When Charles's late husband was diagnosed with Alzheimer's in 2002, Parents began renting the bait shop from Charles. In 2010, Charles sold the property to Parents. Charles then leased back the home she had lived in for forty years, which was located on the same property. In the lease, the parties designated a room in Charles's house as a nursery because Charles spent so much time with Children.

Parents separated in 2014, and the Doehners moved to South Carolina and began living with Mother and Children. According to Laura Moyer, the guardian ad litem, Charles reached out to the Doehners for help "because things with [Mother] and [Father] were so bad."

Parents' divorce was final in early 2015.[1]  Moyer described it as a contentious divorce that included allegations of mental health issues and drug abuse.  During the pendency of the divorce proceedings, Father was awarded visitation as part of a temporary order, and Charles testified she visited Children every other weekend through Father's court-ordered visitation.  The final order, however, awarded Mother custody of Children and left visitation at Mother's discretion.  Mother obtained the bait shop in the divorce and, according to Moyer, "was still making payments to [Charles] for the mortgage."

Charles testified she was not permitted to visit after Parents' divorce but "had contact with [Children] on several different occasions."[2]  Moyer reported Charles was prevented from seeing Children due to strain between Mother and Charles.  She explained "Charles lived almost directly behind the bait shop" but did "not hav[e] a lot of contact with [Children] unless it was through [Father's] visitation time."  Moyer stated Charles could "see [Children] from afar at the bait shop but was not able to have contact with them."

On September 29, 2017, Father murdered Mother.  Father subsequently pled guilty to murder and is serving a forty-five year sentence.  In October 2017, the Doehners filed an action for custody.  The family court held a final hearing on April 19, 2018, and awarded the Doehners custody.  When the Doehners obtained custody of Children, they began managing the bait shop, which passed to Children after Mother's death.  The Doehners evicted Charles from the home on the property.

On April 16, 2018, Charles filed this action for visitation.  Following a temporary hearing, the family court ordered Charles "to attend counseling and follow the recommendations of [C]hildren's counselor in order to obtain visitation."[3]  On July 22, 2019, the Doehners filed an action for TPR and adoption.[4]

---

[1] The record contains conflicting evidence about the date of the divorce.  In an affidavit, Sharon averred the divorce was final in January 2015, but in their brief, the Doehners contend the divorce was final on January 30, 2016.  Charles testified the divorce occurred at the end of February 2015.

[2] In an affidavit, Charles alleged she last saw Children in February 2014.

[3] The record does not contain the temporary order, which was filed in September 2018.  Charles testified the hearing occurred in July.

[4] Charles's motion to intervene in that action was denied by the family court, and Charles has appealed that order; this court will address that appeal in a separate opinion.

In August 2019, the family court held a four-day hearing on Charles's visitation action. Amy Cantley, a counselor, testified she began counseling Children for grief in May 2018.[5] She had seen them approximately twenty to thirty times, and she diagnosed them with post-traumatic stress disorder (PTSD). Cantley averred Children's PTSD was caused by seeing Father abuse Mother while they lived together and knowing Father murdered Mother.

Cantley testified Children told her they had lived with Charles "for a long period of time" and began living "with the Doehners . . . after the divorce." She averred Charles was Children's primary caretaker prior to Parents' divorce and the most stable person in Children's lives at that point. Cantley testified Child 1 said "he was eight years old when he had constant contact with Ms. Charles," which was about five years before. She stated "there were a lot of times that they had a good time and they would play games," but Children "didn't like [Charles's] food because it was different." Cantley explained she questioned Children extensively about the food because of concerns that Charles did not feed them, "[a]nd what came out of that was the food was different, . . . it was country food, but ultimately [Child 1] said that there was food; he just didn't like it."

Cantley testified Children were concerned about visitation because they were told "Charles was trying to take them away." However, Cantley testified Children's fear "was taken down a couple of notches" after she explained Charles was just trying to spend time with them and did not intend to take them from the Doehners. Cantley stated Children were also afraid "it would be like the past." When asked what the fears were, Cantley replied, "I would say mostly from [Child 1] and disagreements and difference in raising from Ms. Charles and the Doehners, per se." She explained "there was a lot of butting heads back and forth" with Child 1.[6] Cantley acknowledged Children were still afraid of Charles but believed their fear had reduced over time.

Cantley noted Children already knew Charles as their grandmother and opined it was in Children's best interest to allow some visitation, but she did not have enough information to suggest how often visitation should occur. She recommended "trying it once and . . . kind of coming back to the drawing board [to see] how they feel about it and working together," and she averred "it would be

---

[5] Cantley was qualified as an expert, but the record does not indicate her area of expertise or contain testimony about her background or credentials.
[6] The record does not contain testimony from Cantley regarding any other specific details about the past other than to indicate Children did not like Charles's food.

good for [Children] to be able to make up their own mind [about visitation] at [their] age[s]." Cantley recommended supervising any visitation and stated she would be willing to do so. She believed it was in Children's best interest to have a visit, "see how it went[,] and see if there need[ed] to be a next" visit. Cantley explained, "[I]f it hurts them[,] we can work through things. If it's only one visit, it's only one visit. If it turns into something beautiful, hypothetically, we'll see. We don't know." Cantley stated the Doehners and Charles were "very, very different," but she believed they all had the ability to protect Children from harm.

Moyer acknowledged Children reported being afraid of Charles but stated, "Two of them are more concerned about it than one." When asked whether Children "made it plain to [her] that they [knew] they weren't allowed to talk to" Charles, Moyer replied, "They never came right out and said that." However, she did not believe "they felt free" to hug Charles. When asked whether Charles caused them stress, she replied, "[T]he fact they were always there [at the bait shop] and [Charles] lived there or [was] there often . . . , I can see how anything that's unspoken or they could sense tension, even if nothing's said, and that that would be very stressful."

On October 8, 2019, the family court issued a final order awarding Charles visitation. Pertinently, the court found (1) the Doehners and Charles "did not get along and that there was obvious dislike and distrust between" them; (2) Cantley investigated the Doehners' concerns about Charles and found them "unwarranted"; (3) Cantley believed Children "would benefit in having some control in" decisions about visitation; (4) Father was unfit; (5) the Doehners unreasonably denied Charles visitation for more than ninety days; (6) awarding "visitation would not unreasonably interfere with the parent-child relationship" between the Doehners and Children; and (7) visitation was in Children's best interest. The court ordered Charles to meet with Cantley three times in September 2019; thereafter, the court awarded Charles two supervised visits of up to four hours each in October and November 2019, and three supervised visits of up to four hours each in December 2019 and January 2020. The court provided Cantley could "terminate the visitations early if she believe[d]" it was in Children's best interest. For February and March 2020, the court awarded Charles unsupervised visitation one weekend per month on Saturday from 10:00 a.m. until 4:00 p.m. and Sunday from 1:00 p.m. until 5:00 p.m. Thereafter, the court awarded Charles unsupervised visitation one weekend per month from Friday at 6:00 p.m. until Sunday at 6:00 p.m. The court also awarded Charles a week of summer visitation in 2020, three weeks of visitation each summer beginning in 2021, a week of visitation during Christmas break beginning in 2021, and visitation on Children's birthdays beginning in 2020.

The Doehners filed a motion to reconsider, which was denied.  This appeal followed.[7]

On appeal from the family court, this court reviews factual and legal issues de novo.  *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011); *Lewis v. Lewis*, 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011).  Although this court reviews the family court's findings de novo, we are not required to ignore the fact that the family court, which saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony.  *Lewis*, 392 S.C. at 385, 709 S.E.2d at 651-52.

Our General Assembly has enacted a statute setting forth when a family court may award visitation to a grandparent.  Pursuant to that statute, the family court has exclusive jurisdiction

> to order visitation for the grandparent of a minor child where either or both parents of the minor child is or are deceased, or are divorced, or are living separate and apart in different habitats, if the court finds that:
>
> (1) the child's parents or guardians are unreasonably depriving the grandparent of the opportunity to visit with the child, including denying visitation of the minor child to the grandparent for a period exceeding ninety days; and
>
> (2) awarding grandparent visitation would not interfere with the parent-child relationship; and:
>
>> (a) the court finds by clear and convincing evidence that the child's parents or guardians are unfit; or
>>
>> (b) the court finds by clear and convincing evidence that there are compelling circumstances

---

[7] In her brief, Charles asserts she still has not had visitation.  She filed contempt actions on November 1, 2019, November 15, 2019, and February 3, 2020; they were scheduled to be heard May 28, 2020.

> to overcome the presumption that the parental
> decision is in the child's best interest.

S.C. Code Ann. § 63-3-530(A)(33) (Supp. 2019).  "Section 63-3-530(33) is in derogation of the common law and therefore must be strictly construed."  *Brown v. Key*, 425 S.C. 490, 499, 823 S.E.2d 212, 217 (Ct. App. 2019).

Initially, the Doehners did not argue to the family court that it could only consider the period between Charles's February 2018 email requesting visitation and the filing of her complaint when determining whether she was unreasonably denied visitation for ninety days.  Thus, this argument is not preserved.  *See Doe v. Doe*, 370 S.C. 206, 212, 634 S.E.2d 51, 54 (Ct. App. 2006) ("To preserve an issue for appellate review, the issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the [family] court.").  Because the Doehners failed to preserve this argument, we decline to address it.  *See Ex parte Morris*, 367 S.C. 56, 65, 624 S.E.2d 649, 654 (2006) (acknowledging appellate courts can overlook procedural rules when the rights of minors are involved but "declin[ing] to exercise [its] discretion to avoid application of the procedural bar").[8]

Assuming this statute was triggered by Charles's February 2018 email requesting visitation, the undisputed evidence showed that by the time of the August 2019 final hearing, the Doehners had denied Charles visitation for nearly eighteen months.  Thus, Charles was denied visitation for more than ninety days.  Further, we find the denial of visitation was unreasonable.  *See Bazen v. Bazen*, 428 S.C.

---

[8] Contrary to the Doehners' assertion, this is not an issue of subject matter jurisdiction.  *See Badeaux v. Davis*, 337 S.C. 195, 205, 522 S.E.2d 835, 840 (Ct. App. 1999) ("Lack of subject matter jurisdiction can be raised at any time, can be raised for the first time on appeal, and can be raised *sua sponte* by the court." (quoting *Lake v. Reeder Constr. Co.*, 330 S.C. 242, 248, 498 S.E.2d 650, 653 (Ct. App. 1998))).  Although the grandparent visitation statute is contained in the general statute outlining the family court's jurisdiction, the Doehners' argument does not concern whether the family court had "the power to hear and determine" this case.  *See Dove v. Gold Kist, Inc.*, 314 S.C. 235, 237-38, 442 S.E.2d 598, 600 (1994) ("Subject matter jurisdiction is 'the power to hear and determine cases of the general class to which the proceedings in question belong.'" (quoting *Bank of Babylon v. Quirk*, 472 A.2d 21, 22 (Conn. 1984))).  There is no question the family court had "the power to hear and determine" this case; the only question is whether the family court properly applied the statute in awarding visitation.  Thus, this is not an issue of subject matter jurisdiction.

511, 523, 837 S.E.2d 23, 29 (2019) ("The important question for the 'unreasonably' requirement . . . is whether [the custodial party] has any reason to prevent the visitation. If she has a legitimate reason to do so, the Due Process Clause and subsection 63-3-530(A)(33) require that her reasonable decision be honored.");[9] *id.* at 524, 837 S.E.2d at 30 (noting the grandparent requesting visitation bears the burden of proving the denial of visitation is unreasonable). Initially, we are concerned that two of Charles's adult children overdosed on drugs in her home. However, the evidence did not show Charles used drugs or condoned their drug abuse. Although this is concerning, we believe it does not justify the Doehners denying Charles *any* contact with Children.[10]

Further, we disagree with the Doehner's assertion that Charles was disinterested in Children or in visitation. The evidence showed that prior to the Doehners moving to South Carolina, Charles was around Children frequently and was possibly a primary caregiver for them. Charles testified she babysat Children and they often spent the night at her home prior to Parents' divorce. Charles's adult son Steve testified Parents "took turns going off benders," and Charles "was always there when [Children] were younger." Likewise, Charles's adult daughter and Steve both testified they were jealous of the amount of time Charles spent with Children. Additionally, the fact Parents and Charles included a clause in Charles's lease designating a room in her house as a nursery showed Charles spent a significant amount of time with Children prior to 2013 or 2014. The foregoing showed Charles had a developed relationship with Children prior to Parents' divorce.

Likewise, the evidence did not show Charles was disinterested in visitation. Charles testified she visited Children every other weekend when Father had court-ordered visitation. Thereafter, Charles stated she requested visitation from Mother "fairly frequently," but Mother gave her the run-around and said she had to "check their schedule" and "ask [her] mom." After Father murdered Mother, it was reasonable for Charles to give the Doehners some space before requesting visitation. However, the foregoing does not show Charles was disinterested in

---

[9] The Doehners do not have a constitutionally-protected interest in Children because they are not biological or adoptive parents. However, they have filed a separate action for TPR and adoption. For judicial economy, we will analyze this as if they had a constitutionally protected interest in Children.

[10] To the extent the Doehners were legitimately concerned about Children's safety with Charles, they could have offered some form of supervised contact. This is especially true considering Charles lived on the same property as the bait shop the Doehners managed.

Children or in visiting.  The foregoing evidence showing Children formerly had a relationship with Charles coupled with the Doehners' disdain for Charles convinces us the Doehners' denial of visitation was unreasonable.[11]  *See id.* at 524, 837 S.E.2d at 30 ("Animosity toward the grandparents is not a valid reason to deny them visitation.").

Further, to the extent the Doehners assert they denied Charles visitation based on Children's fear of Charles, Cantley testified Children were concerned because "they were told . . . Charles was trying to take them away."  However, Cantley stated Children's fear of visiting was reduced after Cantley explained Charles did not want "to take them away."  The foregoing suggests Children's fear could be addressed through therapeutic visitation.  Additionally, Craig admitted he was not alleging Charles physically abused Children or had a drug addiction.  Overall, the evidence suggests the Doehner's denial of visitation was motivated by animosity rather than a legitimate concern for Children.  *See id.* ("[A] reasonable denial of visitation must have some basis in the parent's view of the best interest of the child.").  Based on the foregoing, we find the Doehners unreasonably denied Charles visitation for a ninety-day period.

We also find the award of visitation is reasonably tailored such that it will not interfere with the parent-child relationship between Children and the Doehners.  Under the family court's order, Charles will receive one weekend of visitation per month, three weeks of visitation in the summer, visitation on Children's birthdays, and a week of visitation during Christmas break beginning in 2021.  Charles has indicated she intends to visit Children at her daughter's home, which is in the same community Children live in.  Thus, this award of visitation does not interfere with the parent-child relationship.

Finally, compelling circumstances overcome the presumption that the parental decision to deny visitation is in Children's best interest.[12]  *See id.* at 525, 837

---

[11] The overwhelming evidence showed the Doehners strongly disliked Charles. Sharon candidly admitted she called Charles "socially retarded" in a deposition. Additionally, the Doehners evicted Charles from the home Charles sold to Parents after the Doehners attempted to use the room designated as a nursery for storage.

[12] Although the family court did not make a finding under this prong, we do so under our de novo review.  *See id.* at 527-28, 837 S.E.2d at 31-32 (determining the family court did not set forth a sufficient basis for finding compelling circumstances but using its de novo review "to examine whether the grandparents established compelling circumstances by clear and convincing evidence").

S.E.2d at 30 ("Compelling circumstance" as used in subsection 63-3-530(A)(33)(2)(b) is construed narrowly "in light of the constitutional rights it is designed to protect."); *id.* ("[A] family court may not overrule a fit parent's decision and impose grandparent visitation based on its own view of the child's best interests, or its own conception of what is a compelling circumstance."); *id.* ("[T]he grandparents must satisfy this element with clear and convincing evidence of 'compelling circumstances' to overcome the presumption in favor of a fit parent's decisions about her children."). Most of the South Carolina cases addressing compelling circumstances involve a deceased parent. Although Mother is deceased, her parents are not seeking visitation. Thus, the rationale of maintaining ties with a deceased parent's family does not apply here. *See Marquez v. Caudill*, 376 S.C. 229, 249, 656 S.E.2d 737, 747 (2008) ("[A] biological parent[']s death and an attempt to maintain ties with that deceased parent[']s family may be compelling circumstances justifying ordering visitation over a fit parent[']s objection."). Further, it would not be prudent to find Father's incarceration for murdering Mother is a compelling circumstance that supports awarding Charles visitation.

However, our supreme court's recent opinion in *Bazen* is instructive. There, our supreme court determined the mother's "intentional, deceptive, and contemptuous behavior . . . [was] a compelling circumstance that justifie[d]" ordering visitation. *Bazen*, 428 S.C. at 529-30, 837 S.E.2d at 33-34. Specifically, the court found the mother "manipulated the judicial process" by pretending to consent to visitation while "consistently *refus*[*ing*] to permit it." *Id.* at 527, 837 S.E.2d at 31-32. Likewise, she was held in contempt for failing to comply with the visitation ordered by the family court.[13] *Id.* at 528, 837 S.E.2d at 32. She also refused to allow the grandparents phone contact. *Id.* at 529, 837 S.E.2d at 32. Our supreme court admonished:

> Ordinarily, deceptive behavior within families is beyond the power of the court to address. Deceptive behavior must end, however, when family members bring their disputes into the court system. [The mother's] repeated representations to the family court—and in turn this

---

[13] The final order awarding visitation was issued in November 2017. *Id.* at 518, 837 S.E.2d at 26. Our supreme court allowed the parties to supplement the record with a "September 2018 order finding [the mother] in contempt for continuing to refuse to allow visitation." *Id.* at 528, 837 S.E.2d at 32.

> Court—that she welcomes visitation, when in fact she
> refuses it, is unacceptable.

*Id.* at 528, 837 S.E.2d at 32. The court determined the mother's behavior "directly and adversely affected the welfare of the children" by "damag[ing their] previously positive and loving relationship with their grandparents" and placing them "in the completely inappropriate role of mediating the dispute between [their] grandparents and [their] mother." *Id.* at 529, 837 S.E.2d at 32-33.

Like the mother in *Bazen*, there is evidence the Doehners have attempted to manipulate the judicial process. *See id.* at 527, 837 S.E.2d at 31-32 (finding the mother "manipulated the judicial process" by pretending to consent to visitation while "consistently *refus*[*ing*] to permit it"). Specifically, the Doehners submitted to this court and the family court a November 2019 affidavit signed by Cantley indicating Children were not ready to begin visitation.[14] However, Cantley later wrote a letter asserting she did not agree with the November 2019 affidavit and only signed it because she felt threatened by Craig, who refused to leave her office until she signed it. The family court, who was in the best position to assess the credibility of the parties, determined the Doehners were attempting to mislead the court with the affidavit. We are troubled by this attempt to manipulate the judicial process, and it calls into question the Doehners' credibility about the issues raised in this case. *See id.* at 528, 837 S.E.2d at 32 ("Ordinarily, deceptive behavior within families is beyond the power of the court to address. Deceptive behavior must end, however, when family members bring their disputes into the court system.").

We further find the Doehners' behavior "directly and adversely affected the welfare of [C]hildren" by "damag[ing their] previously positive and loving relationship with" Charles. *Id.* at 529, 837 S.E.2d at 32-33. Although we are concerned that two of Charles's sons overdosed on heroin in her home, the other concerns expressed by the Doehners were unfounded. For example, although they complained about the condition of Charles's home, Charles was leasing that property from the Doehners, who were managing the property on behalf of Children. The Doehners acknowledged they had evicted Charles from that home, and Moyer indicated Charles could use her daughter's home for visitation.[15] Further, although the Doehners asserted Children were not adequately fed at

---

[14] The Doehners submitted this affidavit as part of a supersedeas they filed with this court, which was denied.

[15] No one expressed concern about the condition of this home.

Charles's house, Cantley explored that issue with Children and determined it was unfounded. Overall, the Doehners' primary concern with visitation was Children's fear, which arguably was exasperated by the Doehners' animosity toward Charles.[16] However, based on Cantley's testimony that their fear was reduced after she explained Charles was not trying to remove them from the Doehners, and evidence showing Charles had a significant role in Children's early childhood, we find compelling circumstances overcome the presumption that the Doehners' denial of visitation was in Children's best interest.[17] We further note the family court's order, which provided Cantley could "terminate the visitations early if she believe[d]" it was in Children's best interest," provided a mechanism for stopping visitation if it was in fact harmful for Children.

Overall, the Doehners' attempt to mislead the court, their ongoing refusal to allow court-ordered visitation, and evidence showing Children had a relationship with Charles before the Doehners moved to South Carolina are sufficient compelling circumstances to overcome the presumption that the Doehners' denial of visitation was in Children's best interest and to justify awarding visitation. *See Grantham v. Weatherford*, 425 S.C. 111, 118, 819 S.E.2d 765, 769 (Ct. App. 2018) (finding evidence that showed the grandparents developed "deep ties" with their grandchildren may "provide a stronger basis for finding compelling circumstances than in *Marquez*"); *Bazen*, 428 S.C. at 524, 837 S.E.2d at 30 ("Animosity toward the grandparents is not a valid reason to deny them visitation."); *id.* at 529, 837 S.E.2d at 33 (finding the mother's "intentional, deceptive, and contemptuous behavior . . . [was] a compelling circumstance that justifie[d]" awarding visitation).

**AFFIRMED.**[18]

---

[16] Although the Doehners denied speaking badly about Charles around Children, we find their overall credibility questionable in light of their attempt to mislead this court and the family court with a coerced affidavit.

[17] The parties frame this as whether visitation was in Children's best interest. Although best interests is typically the primary consideration in cases involving children, *Bazen* directs, "[A] family court may not overrule a fit parent's decision and impose grandparent visitation based on its own view of the child's best interests, or its own conception of what is a compelling circumstance." 428 S.C. at 525, 837 S.E.2d at 30. Thus, the pertinent question is whether compelling circumstances overcome the presumption that the Doehners' denial of visitation is in Children's best interest, not whether visitation is in Children's best interest.

[18] We decide this case without oral argument pursuant to Rule 215, SCACR.

**HUFF, WILLIAMS, and GEATHERS, JJ., concur.**