# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Allen Lee Jacobs, Meghan Jacobs, Donald L. Jacobs, and Tamila D. Jacobs, Plaintiffs,

v.

Ashley Nicole Zarcone, David Zarcone, Joseph Rose, April Rose and South Carolina Department of Social Services, Defendants,

Of whom Ashley Nicole Zarcone is the Appellant,

and

Meghan Jacobs, Donald L. Jacobs, and Tamila D. Jacobs are the Respondents.

Appellate Case No. 2018-000488

———————

Appeal From Greenville County
Alex Kinlaw, Jr., Family Court Judge

———————

Opinion No. 5901
Heard September 14, 2021 – Filed March 16, 2022

———————

**AFFIRMED IN PART, VACATED IN PART**

———————

Bruce A. Byrholdt and Sarah Ganss Drawdy, both of Byrholdt Drawdy, LLC, of Anderson, and Jeffrey Alton Phillips, of Phillips Law Firm, P.A., of Travelers Rest, all for Appellant.

Bruce Wyche Bannister and Luke Anthony Burke, both of Bannister, Wyatt & Stalvey, LLC, of Greenville, and James D. Calmes, III, of James D. Calmes, III Law Firm, of Greenville, all for Respondent Meghan Jacobs.

Amanda Morris Gallivan, of Christophillis & Gallivan, P.A., of Greenville, and Robert Steve Ingram, III, of Holliday Ingram LLC, of Greenville, both for Respondent Donald L. Jacobs and Respondent Tamila D. Jacobs.

---

**MCDONALD, J.:** Allen Jacobs (Father) died while seeking sole custody of his two minor children, D.J. and M.J. (Children).[1] Following a multi-week trial, the family court awarded custody of the Children to Father's wife, Meghan Jacobs (Stepmother), with supervised visitation granted to the Children's Mother, Ashley Zarcone. Father's parents, Donald Jacobs and Tamila Jacobs (Paternal Grandparents), intervened and were awarded visitation rights. Mother challenges both the custody and visitation awards, arguing the family court erred in declaring her unfit and finding Stepmother was the Children's de facto custodian and psychological parent. We affirm in part and vacate in part.

**Facts and Procedural History**

The facts of this case are complex and tragic. Mother and Father married in 2006 and separated in 2011. They had two sons, D.J. in 2009 and M.J. in 2010. In 2013, the family court granted Mother and Father a divorce and awarded them joint custody of the Children, with Mother having primary placement and Father having "liberal visitation." The family court noted either party could request in writing that certain standard visitation guidelines be applied.

In late May or early June 2013, Mother met David Zarcone—the couple married the following September. Mother and David had one child together in 2014, L.Z., and David had visitation with one child from a previous relationship.

---

[1] Father, a police officer with the Greenville Police Department, was killed in the line of duty.

On August 8, 2014, Father filed an action seeking modification of visitation and child support.  By order dated February 3, 2015, the family court approved an agreement between Mother and Father establishing joint custody, with Mother having primary placement and Father having visitation on alternating weekends, along with overnight Wednesday visits during the weeks he did not have weekend visitation.  The agreement also addressed summer visitation and prevented any stepparent from administering corporal punishment.  The family court's order included the parties' agreement that "Linda Hutton, MSW, shall be used to counsel the minor sons and provide family counseling to the extent Ms. Hutton deems appropriate."

A few days after the family court issued the February 2015 order, four-year-old D.J. sustained injuries in Mother's bathroom while Mother was at work and David was the only adult at home.  Mother testified David called her at work and told her D.J. woke him up and told him he needed to use the bathroom:

> David said, okay, go to the bathroom.  David rolled over
> to go back to sleep.  And then he heard [D.J.] crying.
> [D.J.] came and woke him back up and said, I just fell
> going to the bathroom.
>
> He—I got on the phone with [D.J.], asked him if he was
> okay.  Calmed him down.  He stopped crying.  He said he
> was fine.  I got back on the phone with David and David
> said that he [saw] where he thought there was going to be
> a knot on his forehead right there where he had hit the
> tub and that he was going to put some ice on it or put a
> cold rag on it and that he would stay up and monitor it
> until I got home.

However, the Children reported to others that David pushed D.J. down in the tub.  Mother does not believe David caused D.J.'s bruising that night; she claims D.J. told her he slipped on some clothes on the bathroom floor.  Mother did not tell Father about the bathroom incident when they next exchanged custody.

On February 12, 2015, when Stepmother picked the Children up from school for Father's long weekend visitation, she noticed yellowish bruising on D.J.'s face.  She described this at trial as "excessive bruising."  After Father examined D.J.'s face, Stepmother dropped the Children off to spend the night with Paternal Grandparents because Father had to work and Stepmother had a night class.

Although Stepmother told Paternal Grandparents that D.J. had fallen and hit his head in the bathtub, Paternal Grandmother became alarmed during D.J.'s bath time when she found the bruising was not just to the child's face or head, but on his back and on one arm as well.  Grandmother explained,

> I discovered he had all these circle marks on his back.
> And then right around here on one of his arms.  I think it
> was his left arm.  But he had these marks there that
> looked like three finger marks that someone had grabbed
> him.  And so it wasn't just his head, but then there was
> these marks all over his back and on his arms.

The next morning, Father, Stepmother, and Paternal Grandmother took D.J. to the emergency room at Greenville Memorial Hospital.  Dr. Elizabeth Foxworth, a pediatric emergency room physician, treated D.J. and observed bruising on his arms, face, and back, and behind his ears. Dr. Foxworth testified, "I saw lots of bruises on him in unusual locations."  When asked what she meant by "unusual locations," Dr. Foxworth explained, "You rarely get bruises on your back or in particular he had one behind his ear.  It was just really unusual places that are suggestive of child abuse."[2]  Dr. Foxworth ordered lab work to rule out a medical condition as the cause of the bruising and subsequently diagnosed D.J. with bruising consistent with child abuse.  Dr. Foxworth then referred D.J. to the Julie Valentine Center[3] for an evaluation.

South Carolina Department of Social Services (DSS) Investigator Bailey Thomas responded to Greenville Memorial Hospital after DSS received the report of suspected child abuse.  Thomas observed D.J. had an "excessive" number of bruises, which she believed were inconsistent with a fall.  During her investigation, Investigator Thomas met with D.J. and M.J. separately.  Because of what she learned during these interviews, Thomas opened an investigation.

---

[2] At trial, Dr. Foxworth identified a drawing she made of D.J.'s bruising during her medical examination and noted she did not typically illustrate a patient's injuries— only having done three or four such drawings in her twenty-one-year career.  Dr. Foxworth documented the locations of D.J.'s bruises because she was concerned he was being abused and these bruises "were just not where kids typically get bruises."

[3] The Julie Valentine Center is a child abuse recovery center in Greenville County.

On February 19, 2015, Mother, David, and Father entered a DSS Safety Plan, which also covered L.Z (Mother and David's child). The safety plan listed Mother as protector for the three children and specified that Children would not be alone with David. The expected end date for the Safety Plan was set at "no later than ninety days."[4]

On March 30, 2015, DSS indicated a case against David for "physical abuse and substantial risk of physical abuse." The DSS Determination Fact Sheet reported "[D.J.] was observed to have faint bruising on his back, ribs, scalp and a linear bruise on his face. Bruising appears to be at least a week old." The Fact Sheet further reported "[D.J.] states that he was pushed by David and hit his face on the bathtub. Minor children report being afraid to be alone with David Zarcone because he hurts them." In the "Family Story" portion of the Family Assessment, DSS noted:

> Ashley [Mother] states that she divorced Allen Jacobs [Father] due to his controlling behaviors. Ashley stated that she [remarried] and has a baby with her current husband David Zarcone. Ashley stated that [Father] is upset that their children [M.J.] and [D.J.] started calling David dad and [Father] doesn't want them to. Ashley stated that she noticed this is when DSS started getting called on her. Ashley stated that [Father] called DSS on her saying that [M.J.] was being abused by David first now it's [D.J.]. Ashley stated that she knows that [Father] is telling the kids to say that David is abusing them but she knows that he is not. David Zarcone denies pushing stepson [D.J.] causing [him] to fall and hit his face on the tub. David stated that the only thing he does as far as punishment is timeout and they have a chair that they make the kids use. David stated that one time he did spank the boys but used his hand to spank them on their bottoms and only did this one time. David stated that he is the father figure inside the home and does feel that the boys need to listen to him when they are with him alone. Minor children [M.J. and D.J.] report being afraid to be alone with David Zarcone. Both stated that he is mean to

---

[4] Ninety days after February 19, 2015, would have been May 20, 2015.

them and slams them down on their backs and when they tell him to stop he says they better not tell their mother or they will have to go to timeout. [D.J.] stated that David was in the bathroom with him and pushed him down causing him to hit his head on the tub.

On March 31, 2015, DSS performed a home visit and entered a new safety plan with Mother. This revised plan specified, "Mother will ensure there is no contact between David Zarcone and the minor children [M.J. and D.J.]." Investigator Thomas and her supervisor, Jacquelynn Brawner, determined the safety plan needed a revision to prohibit all contact between the Children and David based on their review of the Children's interviews from the Julie Valentine Center and D.J.'s medical records. Thomas emphasized the March 31 safety plan prohibited David from having any contact with the Children, including holidays, and any change in the safety plan "would need to be in writing." This safety plan was set to end not later than ninety days, or by June 29, 2015. In Thomas's case dictation from this home visit with Mother, Thomas noted, "DSS is worried about David's contact with the children. [Mother] is worried about David having to leave the home."

Despite the March 31 safety plan's specific "no contact" provision, Mother, the Children, L.Z., David, David's child from a previous relationship, and Mother's parents (Maternal Grandparents) celebrated Easter together just five days later. That same day, Mother took D.J. to the hospital after he fell down the stairs. Mother testified David was in a different room (possibly the kitchen) when D.J. fell on the stairs; however, she acknowledged that the Children allege David pushed D.J. down the stairs.[5] Mother does not believe this was an emergency but claimed she took D.J. to the hospital as a precaution because DSS supervisor Brawner told her if anything happened to D.J. during the investigation "to just take him to the hospital and get it on the record as to what happened." When asked about the Easter violation of the safety plan, Mother testified that Brawner told her it was fine for the family to attend Easter church together, so long as David was not alone with the Children. However, Brawner denied authorizing this holiday contact. She further noted such would be nonsensical because she had just revised the safety plan to "make it strict that there's no contact." Moreover, no such change would be made without staffing the case and receiving input from the caseworker.

_____

[5] David testified he was in the kitchen when D.J. slipped and fell down the stairs.

On Father's Day weekend in June 2015, again prior to the expiration of the safety plan, Mother's family, including the Children and David, took a trip Florida to visit Mother's brother. David admitted he knew the safety plan was still in place at the time of the trip and that it prohibited him from having any contact with the Children. However, like Mother, David claimed someone at DSS had given Mother permission for David to go on the trip.

On June 29, 2015, Mother and David got into a disagreement at a Travelers Rest Walmart in the presence of M.J., D.J., and L.Z. David became angry when the Children "started running around and acting like kids" and Mother did not discipline them. Mother told David she did not want him yelling around the Children, and he grabbed her wrist and tried to remove her wedding ring. Mother attempted to avoid David for the rest of the day, but after the Children went to bed, he resumed yelling at her for not disciplining or spanking the Children.

The next day, Mother and David were involved in another altercation, which resulted in David's arrest for criminal domestic violence (CDV). Mother testified David became agitated after speaking with his ex-wife, who was denying David visitation with his son. David left to buy cigarettes and "basically cool off"; however, he was even more upset upon his return. When Mother went upstairs to get L.Z. to take him to Maternal Grandparents' house, David "got really mad." He followed Mother upstairs, prevented her from going into L.Z.'s room, backed her into their bedroom, waved his finger in her face, and stated she "wasn't going to take his son away from him." David told Mother she "wasn't going to leave him" and flicked some cigarette ashes on her while backing her into a closet. At trial, Mother claimed she bent down to pick up the cigarette butt after David dropped it, but stood up at the same time David was closing a door, and the door "smacked [her] on the arm." David then followed Mother down the stairs and out the door, continuing to yell at her and initially refusing to allow her to leave.

Eventually, Mother was able to leave the home and call her parents (Maternal Grandparents) to meet her at the police department. Mother claimed she spoke with a police officer because she wanted an officer to escort her home to get L.Z., but the police asked her to give a statement. Mother's father met her at the station and went with the police to get L.Z., and the "next thing [she] knew, David was arrested and in the back of the car and they charged him with criminal domestic violence." Although Mother denied at trial that David struck her, her signed statement to law enforcement reflects her statements that David grabbed her, pushed her into a closet, and struck her while slamming a car door. David completed pretrial intervention for the CDV arrest, Mother and David participated

in anger management and domestic violence counseling, and David completed a twenty-six week Family Violence Intervention Program.

On July 7, 2015, DSS issued a new safety plan, transferring custody of the Children to Father and Stepmother. This plan continued the prohibition of all contact between David and the Children, permitted supervised contact with Mother, and listed Father and Stepmother as the Children's protectors. [6] This safety plan was expected to end on October 7, 2015.

On August 21, 2015, DSS indicated a case against Mother and David, referencing a substantial risk of physical abuse to M.J., D.J, and L.Z. The Determination Fact Sheet reported Mother and David "engaged in domestic violence in the presence of their minor children. David Zarcone was arrested on 6/30/15 and has pending charges of [CDV]. The minor children report being afraid of the parents arguing and fighting in the home." In a subsequent affidavit, DSS Investigator Jamie Dill reported, "Ashley Zarcone is not protective of the children, and her children have disclosed that this is not the first domestic violence incident in the home."

On September 3, 2015, Father filed a motion for temporary relief, seeking sole custody of the Children and a restraining order to prevent David from having contact with them. The family court heard Father's motion on October 8, 2015; Mother was not present. In an October 12, 2015 order, the family court awarded Father temporary custody—finding he had demonstrated a substantial change in circumstances—and granted a temporary restraining order prohibiting David from having any contact with the Children. Mother timely moved to reconsider, which the family court denied by supplemental temporary order on November 10, 2015. In this supplemental order, the family court appointed Lisa Mobley as guardian ad litem (GAL) for the Children and dismissed DSS as a party.

On January 15, 2016, the GAL requested a hearing to address Mother's visitation with the Children. By second temporary order dated March 1, 2016, the family court continued temporary custody of the Children with Father and provided Mother two hours of weekend visitation with the Children. The GAL requested that both stepparents be added as parties to facilitate any necessary restraining orders, parenting guidelines, and co-parenting counseling recommended by Hutton. The family court concurred and reiterated that no party was to allow David

---

[6] Father and Stepmother married in August 2015.

Zarcone "to have any contact with the minor children of this action pending investigation and trial."

On January 29, 2016, DSS closed its case against Mother and David. DSS caseworker Janice Jamison testified she felt comfortable closing the case based on the "no contact" condition ordered by the family court in Father's action. Jamison explained, "DSS knew that the kids were with their father. Custody had been given to him. So the need to stay [involved,] there was no need for that."

On March 18, 2016, Father was killed in the line of duty. On March 28, 2016, Mother requested an emergency hearing and sought custody of the Children. Mother argued "[t]he safety of the children was not a consideration of DSS" since custody of L.Z. was not affected by the DSS action. She further noted she and David had completed "every single requirement DSS placed" on them. Paternal Grandparents filed a motion to intervene, to join DSS as an indispensable party, and to request "permanent joint custody of the minor children together" with Stepmother. Stepmother sought joinder and likewise requested custody of the Children.

By third temporary order dated May 2, 2016, the family court awarded temporary custody of the Children to Stepmother. The family court granted Mother alternating weekend visitation to be supervised by either of her parents, with increased visitation during the summer. The family court again prohibited any party from allowing David "to have any direct or indirect contact with the minor children of this action pending further Order of this Court." The family court granted Paternal Grandparents' motion to intervene and added DSS as a party "for the limited purpose of monitoring visitation and placement" of the Children during the pendency of the current case.

On October 14, 2016, Stepmother moved for temporary relief, seeking an order to prohibit Mother's brother from having contact with the Children and to relieve Maternal Grandparents from the requirement that they supervise Mother's visitation.[7] By pretrial order, the family court trial judge granted Stepmother's "no contact" motion as to Mother's brother during the pendency of the litigation and ordered that the motion to relieve Maternal Grandparents of the supervision requirement be served upon them prior to a December pretrial hearing.

---

[7] Mother's brother pled guilty to a juvenile offense involving the sexual molestation of a child unrelated to this action.

On January 19, 2017, Stepmother and Paternal Grandparents moved to present the Children's out of court statements and other communicative behavior as summarized in reports and trauma narratives from their therapist Natasha Patino.[8] The motion asserted the Children "have made consistent and credible statements within the comfort of therapy sessions that disclose abuse and safety issues" pertinent to the court's consideration of their best interests.

In a series of pretrial orders, the family court addressed several issues raised by the parties, including Stepmother's motion to introduce evidence and testimony about events alleged to have occurred prior to Father's filing of the 2015 custody action. The family court denied the introduction of any pre-2015 matters, but accepted the parties' agreement on the § 19-1-180 motion to present the Children's out of court testimony.[9] Pursuant to this agreement, the family court found the Children unavailable to testify at the final hearing due to their "incompetency, inability to communicate about the offense, and/or the substantial likelihood that the children would suffer severe emotional trauma" from testifying. Thus, therapist Patino would testify as to the children's statements and behaviors during their counseling sessions, and present "information as summarized in the reports and handwritten trauma narratives." Specifically—and in accordance with the agreement—the family court ordered, "The statements and other communicated behavior of the minor children as testified to by Natasha Patino, MA, LPC, are admissible to prove the truth of the matters asserted pursuant to S.C. Code Ann. § 19-1-180(C)."[10]

---

[8] *See* S.C. Code Ann. § 19-1-180 (2014) (providing a process for the admission of out of court statements by children under twelve years of age).

[9] The family court also denied Paternal Grandparents' motion to alter or amend its order barring the presentation of pre-2015 evidence, finding all evidence related to child custody and visitation prior to February 3, 2015 had been heard and litigated on several occasions.

[10] Initially, the Children met with Hutton for grief counseling, but after Stepmother expressed concerns, Patino began counseling the Children in September 2016. Patino was qualified without objection as an expert in counseling, with a specialty in trauma. At the time of her testimony, Patino had conducted twenty-three trauma-focused cognitive behavioral therapy sessions with the Children.

The case was tried April 17–21, October 9–10, October 12, and December 13–14, 2017.[11]  Between trial dates, the family court denied Mother's motion to prevent Stepmother from taking the Children to further therapy sessions with Patino and noted the GAL would assist with resolving such issues that might arise among the parties.

In a detailed February 21, 2018 order, the family court awarded sole custody of the Children to Stepmother.  The family court found Mother unfit due to her inability to protect the Children's physical, mental, and emotional well-being and emphasized its concern regarding Mother's refusal to believe the Children's allegations that David was physically abusive, despite the evidence from experts and DSS caseworkers.  The family court held Stepmother was the Children's psychological parent and de facto custodian and determined it was in the Children's best interests to remain in Stepmother's sole custody.  The family court's order included no contact provisions for David Zarcone and Mother's brother, awarded Mother supervised visitation from Friday through Sunday on alternating weekends, and provided Paternal Grandparents visitation to be coordinated with Stepmother.  Mother has appealed not only the award of sole custody to Stepmother and the requirement that her visitation with the Children be supervised, but the visitation awarded to Paternal Grandparents as well.

**Standard of Review**

On appeal from the family court, the appellate court reviews factual and legal issues de novo.  *Stoney v. Stoney*, 422 S.C. 593, 596, 813 S.E.2d 486, 487 (2018) (per curiam).  Thus, the appellate court has the authority to find facts in accordance with its own view of the preponderance of the evidence.  *Lewis v. Lewis*, 392 S.C. 381, 384, 392, 709 S.E.2d 650, 651, 655 (2011).  However, this broad scope of review does not require the appellate court to disregard the fact that the family court, which saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony.  *Id.* at 385, 392, 709 S.E.2d at 651–52, 655.  Therefore, the appellant bears the burden of convincing the appellate court that the family court committed error or that the preponderance of the evidence is against the family court's findings.  *Id.* at 392, 709 S.E.2d at 655.

**Law and Analysis**

---

[11] Prior to trial, DSS moved to be dismissed as a party.  Upon the family court's inquiry on the record, no party objected to DSS's dismissal so long as any necessary DSS witnesses were made available for trial.

## I. Mother's Fitness

Mother argues the family court erred in finding her unfit based on the February 2015 bathtub incident, the March 2015 Easter incident, the June 2015 CDV and Walmart incidents, and Patino's testimony. Based on our de novo review of the record, the parties' briefing, and oral argument, we affirm the family court's finding.[12]

To determine whether a parent is fit, the court considers "the quality of the home the natural parent can provide as well as the parent's employment stability." *Urban v. Kerscher*, 423 S.C. 615, 625, 817 S.E.2d 130, 135 (Ct. App. 2018). At the time of trial, Mother was employed with a law firm. Mother admitted she and David had past financial issues, but her accounts were current at the time of trial. Although it had not yet been used, Mother had a room ready for the Children at her home. Further, it appears Mother attempted to be involved with the Children's education as much as she was permitted as the non-custodial parent. The record does not reflect that there has ever been an attempt to remove L.Z. from Mother's custody. Following her visit to Mother's home, the GAL had no concerns about the safety of the home itself, and a DSS caseworker noted the environment was "appropriate." Thomas observed the home was clean, there was sufficient food, and Mother had bunk beds ready for the Children.

Nevertheless, like the family court, we have serious concerns about Mother's ability to protect the children from David given her repeated violations of the "no contact" provision in the second DSS safety plan, her continuing refusal to believe David injured D.J., and her minimization of other incidents. *See, e.g.*, *Baker v. Wolfe,* 333 S.C. 605, 610, 510 S.E.2d 726, 729 (Ct. App. 1998) ("That the Mother has allowed her children to be physically abused by the Stepfather indicates that the Mother is either unable to or uninterested in properly protecting the children, and again supports the conclusion that the Mother is not fit to parent her children."). Even though the Children were clearly afraid of David, Mother did not believe their abuse allegations, instead choosing to believe David's accounts of the events. Mother testified she would defer to the recommendations of the counselors regarding the Children's exposure to David in the future but clarified, "I believe that we should sit down and look at all the facts." She explained, the counselor "should know every—both sides of the story from the beginning to the end so they

---

[12] Mother did not appeal the family court's finding that awarding custody of the Children to Stepmother was in the Children's best interests.

can adequately sit down and decide what the boys really need and how it would be best to achieve that." Statements like this demonstrate Mother's continuing denial that David ever abused and frightened the Children.

Although DSS closed its case in January 2016, DSS caseworker Janice Jamison did not believe Mother and David had made behavioral changes. Jamison testified Mother continued to minimize the situation, which was concerning due to the CDV police report and the Children's recounting of events that occurred. As noted above, Jamison felt comfortable closing the case because she believed the "no contact" conditions regarding David imposed by the family court in the custody case would remain.

Mother repeatedly violated the "no contact with David" provision of the DSS safety plan. Mother disputes whether the March 2015 safety plan was still in place at the time of the Walmart incident and claims that in June 2015, she was no longer bound by it. However, it is clear that Mother violated the March safety plan by allowing the Children to be around David both at Easter—when D.J. was again injured—and in early June during the Florida family trip.

Additionally, although Mother maintains David did not push D.J. down the stairs on Easter, the testimony presented at trial was inconsistent. Mother, David, and Maternal Grandmother all provided conflicting testimony as to where David was when D.J. was injured and whether anyone actually saw D.J. fall. Maternal Grandmother's statement to hospital doctors indicated he fell down a flight of stairs, but she testified at trial he only fell down a couple of stairs. Even though these witnesses and parties minimized the incident at trial, they were concerned enough to take D.J. to the emergency room, and he wore a neck brace for a period of time following the fall. Significantly, the DSS safety plan in place at this time clearly prohibited *any* contact between David and the Children, and despite Mother's claim on this point, the overwhelming testimony from the DSS employees at trial demonstrates no caseworker or supervisor would have orally modified the plan to allow such unauthorized contact.

In support of reversal, Mother argues Patino was "one-sided" and suggests Patino exaggerated the Children's fears about David. Yet we note Patino was qualified as an expert without objection, and her testimony regarding the Children's trauma narratives and statements was admitted by agreement of the parties. After meeting with the Children twenty-three times, Patino believed their behavior was consistent with "some kind of trauma happening." During their sessions, Patino observed D.J. would "shut down a lot" when discussing sensitive topics, including David,

and M.J. became very tense and afraid when David was mentioned, at times not wanting to say David's name.  Patino testified the Children consistently reported Stepmother was someone they could trust and they felt safe with her, whereas the Children believed Mother was someone they needed to protect.

Patino conducted a joint therapy session with Mother and Stepmother and explained "in length the fear the boys had" of David.  Patino was concerned Mother's minimization of the situation could put the Children at risk in the future, whether Mother was with David or different partner, because she did not appreciate how serious the issue was for the Children.  Patino did not believe further counseling would assist reunification of David and the Children due to Mother's minimization of these risks and failure to grasp what happened.

The GAL was also concerned about the Children returning to Mother's custody without specific parameters set for David.  The GAL noted Mother never acknowledged the safety risk David posed to the Children; DSS, Patino, and Hutton shared these concerns.  The GAL admitted Hutton agreed to conduct reunification counseling if there were adequate participation by the parties.  Mother and David also believed a "controlled" reunification process would be necessary to reintroduce David to the Children, and David claimed he would continue to participate in counseling if necessary.

We, too are troubled by Mother's refusal to believe the Children's allegations, her minimization of David's conduct, and her pattern of failing to comply with the no contact provisions of the safety plan.  Thus, we agree with the family court that the evidence presented at trial established Mother was not a fit parent due to her inability to care for the Children's well-being.[13]

## II. *Moore* factors

Mother argues the family court erred in applying the factors of *Moore v. Moore*, 300 S.C. 75, 79–80, 386 S.E.2d 456, 458–59 (1989), in its custody determination because Mother "always had custody of her two minor children.  She never relinquished custody (temporary or otherwise) of her children to Stepmother."  She

---

[13] At oral argument, counsel for Mother informed this court that Mother and David have now divorced.  This information was not before the family court; thus, it is not proper for this court to consider it in our review of the family court's order.  We note nothing prevents Mother from filing an action to address this change in circumstances as it may impact the consideration of custody or visitation.

further contends the family court's reliance on *Moore* was misplaced because the Children were transferred from one natural parent (Mother) to the other (Father) under a "voluntary" safety plan signed by Mother. We disagree.

In *Moore*, our supreme court established the factors a court must consider in making a custody determination when a natural parent seeks to reclaim custody of a child from a third party:

> 1) The parent must prove that he is a fit parent, able to properly care for the child and provide a good home.
>
> 2) The amount of contact, in the form of visits, financial support or both, which the parent had with the child while it was in the care of a third party.
>
> 3) The circumstances under which temporary relinquishment occurred.
>
> 4) The degree of attachment between the child and the temporary custodian.

300 S.C. at 79–80, 386 S.E.2d at 458 (citations omitted).

Mother relies on this court's language in *Baker v. Wolfe*, 333 S.C. at 605, 510 S.E.2d at 726, and our return of the minor child to her biological parent in *Urban v. Kerscher*, 423 S.C. at 615, 817 S.E.2d at 130, to support her argument. However, our review of these cases supports the family court's analysis here. In *Baker*, this court found *Moore* inapplicable based on the circumstances surrounding the mother's relinquishment of the children:

> This case began as a custody dispute between parents who had joint custody of the children. There was no court order or agreement between the parents relinquishing custody to the Grandmother. Although the Mother voluntarily relinquished physical custody of the children in 1993, she relinquished custody to the Father, not a third party. Given that the Father resided with the Grandparents, the Mother may well have assumed that the Grandmother would be the primary caretaker of the children. Nonetheless, her relinquishment of the children

> to the Father does not seem to be the same type of relinquishment contemplated in *Moore*. Accordingly, given the unique factual circumstances of this case, we conclude that *Moore* is not controlling, although its factors may provide some guidance. Instead, we believe this case is controlled by a determination of the Mother's fitness as a parent and a consideration of the best interests of the children.

333 S.C. at 610, 510 S.E.2d at 729. The court affirmed the family court's findings that mother was unfit and that custody should remain with the paternal grandmother based on evidence that mother and stepfather were drug users and "[t]hat the Mother has allowed her children to be physically abused by the Stepfather indicat[ing] that the Mother is either unable to or uninterested in properly protecting the children." *Id.* at 610, 510 S.E.2d at 729.

Moreover, *Urban* is inapposite because this court found the mother there to be "a fit parent, able to properly care for Child and provide a good home." *Urban*, 423 S.C. at 626, 817 S.E.2d at 135. Mother lived with her fiancé in a clean and stable home, and Urban's child had a good relationship with the mother's fiancé. *Id.* Urban's relinquishment of her child was truly voluntary, and the court found it "commendable that Urban recognized her previous inability to care for Child and, in good faith, left Child with people willing and able to provide for Child while Urban attempted to better her family's circumstances." *Id.* at 630, 817 S.E.2d at 137.

Here, we agree Mother's relinquishment to Father pursuant to a DSS safety plan was not the same initially voluntary relinquishment addressed in *Moore*. Although Mother agreed to the July 2015 safety plan, she likely faced no reasonable alternative as she sought to cooperate with DSS to expedite the return of the Children to her care. And, we agree that when custody changed, Mother viewed this as relinquishing custody to Father, rather than Stepmother. But as in *Baker*, the family court here properly relied on the *Moore* factors for guidance in considering custody. *See Baker* at 610, 510 S.E.2d at 729. Like the *Baker* court, we believe this case is controlled by a determination of Mother's fitness as a parent and a consideration of the best interests of the children. *See id*. "While there is a presumption in favor of awarding custody to a natural parent over a third party, that presumption applies only if the parent is found to be fit." *Id*. at 611, 510 S.E.2d at 730. Thus, we find the family court properly awarded Stepmother sole custody of the Children.

## III. Psychological Parent

Mother next argues the family court erred in finding Stepmother was the Children's psychological parent because there was no "parental void" in the Children's lives prior to Father's death and she never consented to or fostered a parent-like relationship between the Children and Stepmother.  Mother further contends Stepmother's relationship with the Children was not of sufficient length to rise to the level of a parent-like relationship.  We disagree.

In order to establish the existence of a psychological parent-child relationship, a party must demonstrate:

> (1) that the biological or adoptive parent[s] consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child;
>
> (2) that the petitioner and the child lived together in the same household;
>
> (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; [and]
>
> (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

*Marquez v. Caudill*, 376 S.C. 229, 242, 656 S.E.2d 737, 743 (2008) (alterations by court) (quoting *Middleton v. Johnson*, 369 S.C. 585, 596–97, 633 S.E.2d 162, 168 (Ct. App. 2006)). "[W]hen both biological parents are involved in the child's life, a third party's relationship with the child could never rise to the level of a psychological parent, as there is no parental void in the child's life."  *Middleton*, 369 S.C. at 598, 633 S.E.2d at 169.

In this case, Father consented to and fostered Stepmother's parent-like relationship with the Children. When Father was alive, he worked long hours as a police

officer, and Stepmother acted as a caregiver during Father's visitation periods. Stepmother testified Mother initially encouraged her relationship with the Children, and the two women communicated more than Mother and Father did regarding their care. The Children called Stepmother by her first name, Meghan, and Mother had previously texted Father that the Children could call Stepmother "Mommy Meghan." In any event, whether Mother consented to and fostered the Children's relationship with Stepmother is not controlling because the evidence establishes Father fostered this relationship before his death.

Second, the Children have resided with Stepmother in the same household. The Children began living with Stepmother and Father full time in July 2015. Prior to that, Father and Mother had joint custody, and Father had a very liberal visitation schedule. Thus, the evidence demonstrates the Children have been residing full-time with Stepmother since at least 2015. *See Id.* at 598, 633 S.E.2d at 169 (in determining whether the psychological parent "resided with" the child, the court "can conceive of a situation, as in this case, where the legal parent and the psychological parent operated under a sort of joint custody agreement where the child spends half the time at the legal parent's house. The other half of the time is spent at the psychological parent's house, which the child also considers home. This type of arrangement also suffices to meet the second part of the test.").

Third, Stepmother has "assumed obligations of parenthood by taking significant responsibility for [the Children's] care, education and development, including contributing towards [their] support, without expectation of financial compensation." *See Marquez*, 376 S.C. at 242, 656 S.E.2d at 743 (quoting *Middleton*, 369 S.C. at 597, 633 S.E.2d at 168). While Father was still living, Stepmother undertook many of the caretaking responsibilities for the Children. Her caregiving responsibilities increased when the Children came to live with Father and Stepmother full-time pursuant to the July 2015 safety plan. Stepmother took the Children to and from school, to doctor's visits, and to visit Paternal Grandparents. For example, Stepmother arranged for an appointment at the eye doctor for M.J. to get glasses when she discovered he was having difficulty seeing at school. Additionally, Stepmother paid for the Children's counseling sessions with Hutton.

Finally, Stepmother has been in a parental role for a length of time sufficient to establish a bonded, parent-like relationship with the Children. Stepmother first met the Children on Easter weekend in 2013. During Father's visitation periods and after the Children moved in with the couple, Stepmother undertook caretaking duties such as taking the Children to school and doctor's appointments.

Stepmother communicated with Mother about the Children, including keeping her informed about school events. Further, the GAL testified the Children had formed a bonded parent-like relationship with Stepmother. We acknowledge no "parental void" existed until Father's death on March 18, 2016. However, after Father died, Stepmother stepped into Father's shoes as the parental figure who provided security in the Children's lives. Of note is Patino's testimony that the Children consistently reported Stepmother was someone they could trust and that they felt safe with her, whereas the Children believed Mother was someone they needed to protect. Accordingly, we agree with the family court's finding that Stepmother was the psychological parent of M.J. and D.J.[14]

## IV. Grandparents' Visitation Award

Mother argues the family court erred in awarding visitation to Paternal Grandparents because there was no evidence they were ever denied visitation. We disagree.

"[A] biological parent[']s death and an attempt to maintain ties with that deceased parent[']s family may be compelling circumstances justifying ordering visitation over a fit parent[']s objection." *Marquez*, 376 S.C. at 249, 656 S.E.2d at 747. Section 63-3-530(A)(33) of the South Carolina Code (Supp. 2021) grants the family court the following jurisdiction:

> to order visitation for the grandparent of a minor child
> where either or both parents of the minor child is or are

---

[14] Because the Children were not in Stepmother's sole custody for one year prior to the commencement of this litigation, Mother challenges the family court's finding that Stepmother is the Children's de facto custodian. In light of the controlling statutory language, we vacate the family court's de facto custodian finding. *See* S.C. Code Ann. § 63-15-60(A)(2) (2010) (providing a "'de facto custodian' means, unless the context requires otherwise, a person who has been shown by clear and convincing evidence to have been the primary caregiver for and financial supporter of a child who: . . . (2) has resided with the person for a period of one year or more if the child is three years of age or older. Any period of time after a legal proceeding has been commenced by a parent seeking to regain custody of the child must not be included in determining whether the child has resided with the person for the required minimum period.").

deceased, or are divorced, or are living separate and apart in different habitats, if the court finds that:

> (1) the child's parents or guardians are unreasonably depriving the grandparent of the opportunity to visit with the child, including denying visitation of the minor child to the grandparent for a period exceeding ninety days; and

> (2) awarding grandparent visitation would not interfere with the parent-child relationship; and:

>> (a) the court finds by clear and convincing evidence that the child's parents or guardians are unfit; or

>> (b) the court finds by clear and convincing evidence that there are compelling circumstances to overcome the presumption that the parental decision is in the child's best interest.

"When grandparents have such a parent-like relationship, it can be particularly important to the welfare of the children for the court to maintain the relationship." *Bazen v. Bazen*, 428 S.C. 511, 532, 837 S.E.2d 23, 34 (2019); *see also id.* at 536, 837 S.E.2d at 36 (Kittredge, J., concurring in part and dissenting in part) (opining "the critical factor in this case is the prominent and significant role the grandparents had in the lives of their grandchildren prior to the death of" father).

Here, Paternal Grandparents have played an active role throughout the Children's lives, helping to care for them, volunteering at their school, and participating in the DSS safety plan, even when Father was alive. When Mother and Father were still married, the Children spent every Saturday with Paternal Grandparents, and after Mother and Father separated, they spent time with Paternal Grandparents during Father's visitation weekends. The Children have their own room at Paternal Grandparents' house. Paternal Grandmother believed it was very important that she and Grandfather maintain a relationship with the Children to provide extra guidance and support given their Father's death. She explained:

> We feel like the Court has allowed us to be interveners
> and step forward where Allen [Father] is not here. And
> so we love Meghan [Stepmother] and know she's keeping
> them safe. And we appreciate that. But we also know
> that there's some things that we can do that Allen would
> like us to do, I would think.

Over the summer, Paternal Grandparents hoped to take the Children to Texas to spend more time with Paternal Grandmother's mother, and made a plan with Stepmother for the trip. Paternal Grandparents also wanted the Children to see where their late Father spent time during the summers in Texas when he was a child. However, Mother refused to accommodate this request. At that time, Mother had the Children on alternating Tuesdays, every Thursday, and every other weekend; thus, Paternal Grandparents were unable to schedule the trip.

The GAL testified regarding Paternal Grandparents' inability to take the Children on the Texas trip. She stated, "They've told me they've got extended family out-of-state and that their daddy had a history of visiting there. So I think in the future it's important that they be able to have time to be able to take the kids to those places."[15]

The family court ordered Paternal Grandparents "shall have visitation with the minor children as mutually agreed between themselves and [Stepmother]." To the extent the parties could not agree, the court set forth the following schedule: at least one weekend every other month from Saturday at 6:00 p.m. through Sunday at 6:00 p.m., one week in the summer, six hours on Father's Day, two hours on Easter, and five hours on Christmas. We agree with the family court's award of visitation to Paternal Grandparents, and we find it appropriate under the circumstances of this case. Critically, we find the award comports with the language and intent of the jurisdictional statute.

Although Paternal Grandparents were not blatantly denied visitation, certain instances in the record can be construed as unreasonably denying visitation because they demonstrate the inability of Mother, and possibly other parties, to be flexible in rearranging the visitation schedule, even for events or trips that would be beneficial to the Children. *See, e.g., Brown v. Key*, 425 S.C. 490, 498, 823

---

[15] The GAL conducted two phone conferences with the family court regarding visitation periods in an effort to help the parties reach an agreement as to accommodating plans among the various parties. These efforts were unsuccessful.

S.E.2d 212, 217 (Ct. App. 2019) (recognizing the danger that "a parent can circumvent the statute by intentionally and disingenuously thwarting a grandparent's ability to meet the statutory requirements—for example, by allowing grandparents a fleeting visit with a child every eighty-nine days or intentionally offering visitation when parent knows grandparent cannot be available").[16]

Providing a set schedule in the family court's order for Paternal Grandparents' visitation mitigates the risk of future litigation over visitation in this case, which has been in almost constant litigation for the majority of the Children's lives.[17] Accordingly, we affirm the family court's award of visitation to Paternal Grandparents.

**Conclusion**

Based on the foregoing, the family court's order is

**AFFIRMED IN PART and VACATED IN PART.**

**HEWITT, J., and LOCKEMY, A.J., concur.**

---

[16] For example, during the December trial dates, the family court encouraged the parties to work together to develop a Christmas visitation schedule. The parties indicated they had attempted to negotiate the Christmas visitation but discussions had "stalled." However, the parties also indicated they were able to agree on Halloween and Thanksgiving "very quickly." Thus, the family court asked the GAL to facilitate reaching a Christmas visitation schedule.

[17] Notably, Stepmother requested an order granting Paternal Grandparents' claim for visitation. Mother challenged it.